# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____  )
)
FRONTIER AIRLINES, INC.              )
)
     Petitioner,                    )
)
     v.                             )    Case No.: _____
)
TRANSPORTATION SECURITY              )
ADMINISTRATION                       )
)
     Respondent.                    )
_____  )

## PETITION FOR REVIEW

Pursuant to 49 U.S.C. § 46110(a), Federal Rule of Appellate Procedure 15(a), and Tenth Circuit Rule 15, Petitioner Frontier Airlines, Inc. ("Frontier") hereby petitions this Court for review of Respondent Transportation Security Administration's decision upholding the imposition of liability on Frontier for September 11th Security Fees under 49 U.S.C. § 44940 in instances where no passenger traveled on a plane. This decision came in the form of a December 16, 2024 letter to Frontier's counsel from Holly C. Mehringer, Assistant Administrator and Chief Financial Officer of the TSA, which is attached hereto as Exhibit 1.

February 12, 2025

Respectfully submitted,

  /s/ *Adam P. Feinberg*
Adam P. Feinberg
Miller & Chevalier Chartered
900 Sixteenth St. NW
Washington, DC 20006
Telephone:  (202) 626-5800
Facsimile:  (202) 626-5801
Email:  afeinberg@milchev.com

*Counsel for Petitioner*
*Frontier Airlines, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System.  Pursuant to 49 U.S.C. § 46110(b), FRAP 15(c), and Tenth Circuit Rule 15, the Clerk of the Court will serve the Petition for Review on Respondent Transportation Security Administration.  In addition, Petitioner will send a copy of the Petition for Review to:

Francine Kerner, Chief Counsel
U.S. Transportation Security Administration
6595 Springfield Center Drive
Springfield, VA  22150

 /s/ *Adam P. Feinberg*
Adam P. Feinberg

# Exhibit  1



U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598-6014

**December 16, 2024**

**TRANSMITTED VIA EMAIL**

Adam Feinberg
Miller & Chevalier Chartered
900 16th Street NW
Black Lives Matter Plaza
Washington, DC 20006
Email: AFeinberg@milchev.com

Dear Mr. Feinberg:

I write in response to your letter of January 14, 2021, to the Transportation Security Administration (TSA) on behalf of Frontier Airlines (Frontier).  In your letter ("Frontier Letter"), Frontier requested administrative review of TSA's determination, following an audit of air transportation sold between July 1, 2016 and December 31, 2018, that Frontier failed to remit to TSA $5,377,987.35 in September 11th Security Fee ("Fee") amounts that it collected from passengers.  Frontier disputes $5,377,584.15 of TSA's debt determination after remitting $403.20 for undisputed amounts. This letter is TSA's response.

After the audit process was complete and TSA sent a notification of liability to Frontier, Frontier asserted that it was not obliged to remit the Fee amounts in dispute because they were collected from passengers who never travelled.  Frontier explains that the fees in question relate to passengers who purchased air transportation, received what Frontier refers to as a "credit shell" when they canceled their travel, and the credit shell expired unused.  Per Frontier's definition, a credit shell is comprised of *all* money collected from the passenger:

> Once the ticket is cancelled, all of the components of the purchase price – the airfare, taxes, and Fees – *cease to exist*, and all that exists is a credit that is applied to the cancellation fee or issued as a single liability to the customer in the form of the credit shell that the customer can use as he or she likes, or both.

Frontier Letter, Ex. 4, ¶ 7. Whether Frontier may retain as revenue for itself Fees collected from passengers who never flew and did not use the "credit shell" issued to them for the value of that unused ticket including airfare and taxes, and that "credit shell"

is now expired, is the only issue that Frontier contested during the audit or in response to the ensuing $5,377,584.15 notice of liability via its letter of January 14, 2021.

As Frontier was made aware during the audit process (and consistent with the Fee statute, its implementing regulations, and TSA's prior guidance to industry), air carriers may not retain Fee amounts they collect, even if the passenger does not ultimately fly. The Fee statute (49 U.S.C. § 44940) and its implementing regulations (49 C.F.R. part 1510) make clear that carriers are allowed to only possess collected Fee amounts temporarily and that these collections must be remitted to TSA (if not refunded to the passenger), regardless of whether the air transportation is used.

Frontier's contrary interpretation of the statutory and regulatory language is artificial, as it emphasizes one consideration (i.e., whether the passenger has actually traveled) over unambiguous and consistent textual indications that air carriers must collect all Fees based on air transportation *when it is purchased* – and then must ultimately remit those collected Fees to TSA. Frontier's creation of an expiring credit shell is not a refund of the Fee to the passenger. Frontier's proffer further acknowledges that rather than refunding the Fee amounts to passengers in this situation, when issuing credit shells, it combines the Fee amounts it collects from them with all other sums collected at the time the ticket is sold to the passenger in order to create the credit shell, despite a regulatory requirement that air carriers must separately account for Fee amounts at all times. TSA has issued guidance to air carriers regarding situations where the carrier returns the Fee amount collected to a passenger[1], which is consistent with both the statutory and regulatory text as well as TSA's position in this audit: an air carrier that has collected a Fee for canceled air transportation can refund that Fee back to the passenger and claim a credit for doing so, but only if the Fee was remitted to TSA; the air carrier may not retain that Fee.[2] Ultimately, because Frontier chose to retain Fee amounts collected from non-traveling passengers by placing them in an expiring credit shell (rather than returning those Fee amounts directly to the passenger), it cannot rely on its other considerations to supersede the terms and structure of the Fee statute, TSA's implementing regulations, or TSA's guidance.

For these reasons and as set forth in more detail below, TSA upholds the liability imposed based on the final audit report covering July 1, 2016 through December 31, 2018. The accrual of time to delinquency will remain suspended until 30 days after the issuance of this letter.

---

[1] That guidance indicates that where a carrier returns the Fee amounts it collected for a canceled ticket, it may offset that amount from the remittances otherwise due to TSA. TSA-2001-11120-0059, at 2-3 (guidance letter to industry dated Nov. 21, 2002).

[2] S*ee* TSA-2001-11120-0059, at 2 (noting that when a ticket "expires or loses *its* value, the [Fee] involved is subject to a refund by the collecting carrier *to the ticket purchaser*") (emphasis added)).

2

*Procedural Background*

In 2019, U.S. Customs and Border Protection (CBP) conducted an audit of Frontier Airlines on behalf of TSA as authorized under regulation 49 C.F.R. § 1510.19. That regulation provides for authorized representatives to evaluate Frontier's imposition and collection of the Fee. The audit process includes testing to evaluate the accuracy and reliability of Fees imposed, collected, recorded, refunded, remitted, and reported for the time period in question. Importantly, the audit is intended "to determine if any under/over imposition or under/over collection errors existed" during the audit period. The audit provides the air carrier opportunity to provide clarifying information as well as to comment on the proposed findings before they are finalized; Frontier offered comments during the audit process that were addressed by an "Auditor's Rejoinder" in the final audit report, dated August 18, 2020.

On December 18, 2020, TSA notified Frontier that it had accepted the final audit report and was imposing a Fee liability in the amount of $5,377,584.15.[3] In that notification letter, TSA advised Frontier it could seek an administrative review of this liability determination.[4] On January 14, 2021, Frontier submitted a timely request for administrative review that raised a single issue regarding the audit's findings: whether Frontier improperly failed to remit to TSA Fee amounts that it collected when selling air transportation to a passenger who later canceled their travel, where Frontier issued an expiring credit, that credit later expired, and the proceeds of the initial sale became revenue for Frontier. Frontier Letter at 2.

*Factual Background*

Frontier's request for administrative review is based on the following circumstances. When a passenger purchases air transportation from Frontier and later cancels that air transportation, Frontier will either refund the passenger in the original form of payment or issue an expiring credit shell (generally for non-refundable air transportation) for all amounts it collected from the passenger; in many instances, a cancellation fee is charged with the option to use the credit shell to pay the cancellation fee or other method of payment. If the passenger chooses to use the credit shell as a form

---

[3] The audit examined 500 Passenger Name Records (PNR) (containing 1,151 qualifying one-way trips) and identified 12 PNRs (containing 25 qualifying one-way trips) in which the passengers were not refunded, or did not use a credit shells issued in lieu of refunds, prior to expiration of those credit shells. Subsequently, Frontier retained all monies in those credit shells as revenue.

[4] Specifically, the notification letter stated:

> You may make a written request for a review of TSA's determination of this compliance review. This includes any matter that may impact this debt determination, imposition, collection, refunding, remitting, and refunding of the fee during this audit period. The request must also state the basis for the dispute, including all factual information, documentation, citation to authority, argument, fees remitted in error or any other matters that may directly impact the findings, within 30 days of this notification. TSA will deny any requests raised after this timeframe as untimely.

of payment, the difference between the original air transportation value less the cancellation fee remains in the credit shell. Under Frontier's internal accounting practices, "all of the components of the purchase price – the airfare, taxes, and Fees – cease to exist, and all that exists is a credit that is applied to the cancellation fee or issued as a single liability to the customer in the form of the credit shell." Frontier Letter, Ex. 4, ¶ 7. When issuing the expiring credit shell, Frontier first "removes" the fee from TSA's Liability account and as an accounting measure classifies "…that amount as a 'refund,' which results in those funds not being paid to TSA," *id.*, even though a portion of the credit shell exists only because Frontier was required to collect a Fee from the passenger.

The applicable statutory and regulatory provisions governing an air carrier's responsibilities regarding the Fee are found in 49 U.S.C. § 44940 and 49 C.F.R. part 1510. Section 44940 imposes a Fee "on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States" to help defray costs associated with aviation security, including not only the screening workforce and its equipment, but related security measures as well, such as the Federal Air Marshal program, security-related capital improvements at airports, and training offered to pilots and flight attendants. *Id.*, 44940(a)(1)(A)-(I). A Fee is imposed when air transportation is sold and must be collected by the selling air carrier on TSA's behalf. *Id.*, 44940(d)(2), (3). That same section further mandates that

- "[a]ll [Fees] imposed and amounts collected under this section are payable to the" TSA Administrator;

- the carrier is responsible for collecting the Fee when air transportation is sold; and

- the carrier must remit collected Fees and the end of the calendar month after the month in which the Fee was collected.

*Id.*, 44940(e)(1), (2), (3). Finally, while the air carrier may not use collected Fee amounts to offset "the costs of collecting, handling, or remitting the fee," it may retain "interest accruing to the carrier after collection and before remittance." *Id.* 44940(e)(6).

TSA has issued regulations and guidance to air carriers that are consistent with these provisions. In 2002, TSA responded to the request from the Air Transportation Association (ATA) for clarity regarding "the refundability of the [Fee] to ticket purchasers who do not travel on their scheduled flights, particularly where the tickets are nonrefundable and have no value toward future travel," as well as "whether carriers or TSA should provide refunds of [the Fee] to ticket purchasers, as it is common for carriers to have already remitted to TSA the actual fees collected." TSA-2001-11120-0059 at 1. In response, TSA reiterated that when air carriers collect Fees they must "hold them in trust for TSA, and remit them to TSA by the end of the month following the calendar month in which transportation was sold. These air carriers are responsible for the safekeeping and accounting of these fees." *Id.* Regarding ATA's inquiry about refunds, the guidance notes that air carriers "are responsible for refunding [the Fees] to ticket

purchasers," *id.*, and that 49 C.F.R. § 1510.9(b) requires that "[a]ny changes by the passenger to the itinerary" that alter the amount of Fees owed, whether more or less, "are subject to additional collection *or refund of [the Fee]* by the" air carrier that is responsible for collecting and remitting that Fee. *Id.* (emphasis added). Thus, the guidance offers that "[w]hen a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value, the [Fee] involved is subject to a refund by the collecting carrier to the ticket purchaser." *Id.* (emphasis added). Indeed, the collecting air carrier "must" stand ready to "provide the request[ing passenger] with a full refund of the fee" on demand in the event a ticket "expires or loses its value." *Id.*, at 1. That guidance closed with the reminder that "[i]n any case where an air carrier does not refund [the Fees] to the ticket purchaser, *the fees must be remitted to or remain with TSA,*" *id.* (emphasis added), although if the air carrier does make a refund, the carrier may reduce its overall remittance to TSA for that month by the amount of the refund, provided that the air carrier keeps auditable records of the refund, *id.*

Consistent with this 2002 Guidance, in March 2020, TSA-2001-11120-0680, TSA issued additional guidance to air carriers specifically related to refunds "to provide uniform clarification to industry during this unparalleled event [COVID-19 shutdown]." The March 2020 guidance echoed the language from the original guidance discussed above. The March 2020 guidance explains that "[r]etaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund…**If an air carrier does not refund the Passenger Fee to the passenger, the fee shall be remitted or remain with TSA.**" (emphasis in original).

In light of the foregoing and as demonstrated more fully below, Frontier's contentions in support of its request for administrative review fail to account for the clear statutory and regulatory text as well as the guidance from TSA. All of these sources directly address the issues Frontier raises and leave no doubt that when Frontier collected Fees from passengers and later deposited those Fee amounts into credit shells that ultimately expired, those Fee amounts had to be remitted to TSA since they were not returned directly to the passengers in question. Each of Frontier's arguments to the contrary are addressed below.

*1)  Frontier May Not Retain Fee Amounts That It Collects From Passengers.*

By law, an air carrier may not retain as its own revenue a Fee that it was required to collect under 49 U.S.C. § 44940 and ultimately remit to TSA. By regulation, any Fee amounts collected by an air carrier "are held in trust" by that carrier "for the beneficial interest of the United States," such that the air carriers may assert "neither legal nor equitable interest in the security service fees." 49 C.F.R. § 1510.11(b). Air carriers must also "account for security service fees separately," even if the funds from the collected Fees are commingled with other sources of revenue. 49 C.F.R. § 1510.11(c). Once collected from a passenger, an air carrier "must remit *all* security service fees imposed each calendar month to TSA," and is "prohibited from retaining *any* portion" of the Fee in order to offset any administrative costs associated with accounting for collected Fees. 49 C.F.R. § 1510.13(a), (c) (emphasis added). These regulatory terms are fully consistent

5

with Congress's plain direction that "*[a]ll* fees imposed and *amounts collected* under this section are payable to the Administrator of the Transportation Security Administration." 49 U.S.C. § 44940(e)(1) (emphasis added).

Frontier's three arguments to the contrary in its administrative review request are unpersuasive. Frontier asserts that: (a) "[t]here is no authority for TSA to collect any amount unless there is a 'passenger' and unless that passenger has actually engaged in 'air transportation' by being 'carri[ed] by aircraft,'" Frontier Letter at 9; (b) TSA's fee regulations and 2002 guidance letter are inconsistent with 49 U.S.C. § 44940, *id.* at 9-10;[5] and (c) TSA's reliance on 49 C.F.R. § 1510.11(b) (requiring that carriers hold the Fee in trust until it is remitted) is misplaced. *See id.* at 10-11.[6]

      a) *The Law is Unambiguous That the Fee Exists When Air Transportation is Sold and Must Be Remitted to TSA (or Refunded) Irrespective of Actual Travel.*

Frontier's recurring contention in its request for administrative review that no Fee exists at all if a passenger does not ultimately fly is entirely specious. Frontier arrives at its faulty conclusion by selectively isolating just a few words in 49 U.S.C. § 44940(a)(1): that the Fee shall be imposed "on passengers . . . in air transportation." Frontier mistakenly asserts that there is no statutory definition of "air transportation," Frontier Letter at 2, opting instead to highlight the statutory definition of "intrastate air transportation," 49 U.S.C. § 40102(a)(27), as well as the regulatory definition of "air transportation" in 49 C.F.R. § 1510.3, both of which in Frontier's view incorporate the concept of "carriage by aircraft of persons for compensation or hire," *id.*[7]

Frontier's analysis and interpretation is highly artificial, however. Read more fully, Section 44940(a)(1) imposes the Fee on passengers "*of air carriers* . . . in air transportation and intrastate air transportation," such that the phrase "in air transportation" describes the types of air carrier operations that are covered, rather than the passengers themselves. *Id.* (emphasis added). This understanding is reinforced by

---

[5] In support of this contention, Frontier asserts "[s]econdly, and more importantly, even if 49 C.F.R. § 1510.9(b) were read (incorrectly) as suggested by TSA [in the 2002 guidance], the regulation would be invalid because it would conflict with, and exceed the authority granted by, the Fee Statute which, as established above, authorizes TSA to receive funds only when a passenger flies." Frontier Letter at 10.

[6] In connection with 49 C.F.R. § 1510.11(b), Frontier again asserts that "[o]n the law, § 1510.11(b) simply cannot override, or exceed the authority granted to TSA by, the Fee Statute," which "permits TSA to obtain funds only when the customer actually engages in air transportation." Frontier Letter at 11.

[7] Frontier Letter at 2, 8-9, discussing the regulatory definition of "air transportation" provided by 49 U.S.C. § 1510.3, which covers "continental interstate air transportation, continental intrastate air transportation, foreign air transportation, non-continental interstate air transportation, or non-continental intrastate air transportation." Each of these subsidiary forms of "air transportation" have a definition that includes the phrase "the carriage by aircraft of persons for compensation or hire." These definitions do not supersede the statutory definitions, however, nor do they demonstrate that a *passenger* must be transported before any collected Fee must be remitted to TSA.

the statutory definition of "air transportation," which means "interstate air transportation, or the transportation of mail by aircraft," 49 U.S.C. § 40102(a)(5), and the definition of "interstate air transportation," which is "the transportation of passengers or property by aircraft *as a common carrier for compensation*," 49 U.S.C. § 40102(a)(25) (emphasis added).

Frontier's proposed reading of Section 44940(a)—as being applicable only when travel occurs—also cannot be squared with other provisions in Section 44940 that address when a Fee is collected and remitted.  That language demonstrates unambiguously that it is when air transportation is *sold* that "[a] fee imposed under subsection (a)(1) shall be collected by the air carrier," 49 U.S.C. § 44940(e)(2), and that, once collected, the Fee "*shall* be remitted to TSA," without limitation, 49 U.S.C. § 44940(e)(3) (emphasis added).  These provisions require that an air carrier must collect and remit a Fee to TSA without regard to whether travel occurs.

Moreover, Frontier's proposed understanding of Section 44940(a) also cannot be squared with the practical realities of air transportation.  Given the requirement in Section 44940(e)(3) that air carriers remit any Fees collected at the end of the calendar month after the month in which they were collected (a requirement that also does not depend on whether actual "air transportation" occurs). Frontier understandably does not argue or assert that it only collects the required Fee amounts from passengers at the moment when "air transportation" occurs or is about to occur.[8]  Likewise, Frontier's emphasis on "air transportation" as a physical event cannot be squared with the practical reality that many passengers book air transportation far in advance, such that in many instances Frontier is both collecting *and* remitting the Fee before any actual travel occurs.[9]  In light of the foregoing considerations, the contention that "[o]nce a customer cancels the ticket and no longer has any right to engage in air transportation, there cannot be any 'Fee,'" Frontier Request at 11, is untenable.

b) *TSA's Regulations and 2002 Guidance Regarding Refunds Comport With Section 44940.*

Frontier also contends that TSA's regulatory requirement in 49 C.F.R. § 1510.9(b) that air carriers make "additional collection or refund of the [Fee]" when a passenger changes his or her itinerary has no bearing on this issue, and that the 2002 guidance regarding what air carriers should do when a Fee has been collected for a non-refundable ticket is flawed because the guidance relies on this regulatory provision.  Both of these contentions are meritless.

---

[8] Nor does Frontier take the position that, for accounting purposes, it only segregates the Fee amounts that are required from the money collected from the passenger at the moment actual air travel occurs.

[9] This conclusion is reinforced by Frontier's acknowledgement that when issuing an expiring credit shell for canceled air transportation, it "removes" any Fee already remitted to TSA, Frontier Letter at 4, which means Frontier is necessarily remitting collected Fee amounts before transportation occurs (as required by § 44940(e)).

Beginning with Section 1510.9(b) itself, its unambiguous language is instructive in several respects. The Section requires that the Fee "must be based on the air travel *itinerary* at the time the air transportation is *sold*. Any changes by the passenger to the itinerary are subject to additional collection or *refund of the security service fee by the direct air carrier* or foreign air carrier, as appropriate." *Id.* (emphasis added). This language reinforces that an air carrier's obligation to collect and remit collected Fees is not predicated on actual travel but prospective air transportation, as its focus is on the passenger's "itinerary at the time the air transportation is sold" and any subsequent changes to it, rather than any other factor. Second, this language demonstrates that the air carrier's obligation to collect and remit the Fee to TSA when an itinerary changes – or make a refund of any collected Fee to the passenger – depends on further details regarding the change "as appropriate"; this may include, for example, a passenger's decision to change flight times, opt for a different destination, or choose not to fly at all. In any of these circumstances, the air carrier must either remit the collected Fee to TSA or return those amounts collected to the passenger; in no circumstance can the air carrier end up keeping the Fee as its own revenue.

Frontier's related contention that the 2002 guidance letter is flawed because it is wholly dependent on Section 1510.9(b) rests again on an artificial reading of that document. That guidance letter states that an air carrier selling non-refundable air transportation may either refund the Fee collected or remit the Fee to TSA, but may not ultimately retain the Fee amounts collected. In reaching that conclusion, the guidance letter recites the requirements that air carriers collect, safeguard, and remit to TSA fees required by Section 44940, which are found in 49 C.F.R. § 1510.9(a), (c), 1510.11(b), and 1510.13(a). While Section 1510.9(b) is expressly cited and quoted, it is only the last and most salient portion of a larger recitation of an air carrier's responsibilities regarding the collection and remittance of the Fee. Collectively, and as established above, these requirements demonstrate that collected Fees cannot ultimately reside with the air carrier. These regulatory requirements comport fully with Section 44940, such that the bottom-line expectation in the 2002 guidance letter—that air carriers are to refund the Fee to the passenger "*when a ticket loses its value*" (as would be the case when a credit shell expires), *see* TSA 2001-11120-0059, at 1 (emphasis added)—comports with Section 44940 as well. By extension, where an air carrier does not actually return to a passenger a Fee amount that it was only allowed to collect from that passenger by virtue of Section 44940, the carrier cannot merely convert that Fee to revenue. It must remit that un-refunded Fee to TSA.

To the extent Frontier asserts that TSA's interpretation is flawed because "Congress plainly knows how to craft a statute requiring a carrier to give the customer a refund," this contention (invoking the Federal excise tax regime of 26 U.S.C. § 4261) is puzzling in two respects. First, this contention addresses a statutory provision regarding when an *air carrier* may be entitled to a refund of remitted excise tax amounts *from the government*, rather than when a passenger may request a refund from an air carrier. Contrary to Frontier's assertion, however, *neither* regime has a provision expressly addressing when and how passengers are entitled to refunds of Fee amounts collected

from them by an air carrier.[10]  Second, Frontier's contention that the excise tax refund provision (26 U.S.C. § 6415(a)) addresses refunds to passengers is undercut by the Internal Revenue Service's Revenue Ruling 89-109, which was issued to clarify that "to the extent the airline does not refund to the passenger the amount paid for the air transportation, *the collected transportation tax attributable to such nonrefunded amount is to be remitted to the Government*."  TSA-2001-11120-0057, at 2 (emphasis added). This position in the Revenue Ruling about refunds governed by Section 6415 is consistent both with TSA's view that the Fee must either be returned to the passenger or remitted to TSA and with the proposed resolution of this question offered by the ATA when it wrote TSA to convey its members' uncertainty about what to do with Fees collected for non-refundable air transportation that loses value (the very letter that prompted TSA to issue its 2002 guidance on this point).  TSA's position regarding what an air carrier must do with a collected Fee when a credit for nonrefundable air transportation expires is thus fully consistent with the analogous situation arising in the context of Section 6415 as well as the proposed solution recommended by ATA.

### c)  Air Carriers May Not Assert an Equitable or Legal Interest in Fees Collected.

The review request also takes exception to TSA's reliance on Section 1510.11(b) as relevant to this issue.  That provision reinforces that Fees collected by a carrier "are held in trust" by the "carrier for the beneficial interest of the United States" and that the "carrier holds neither legal nor equitable interest in the" Fees (except for the right to keep the interest thereon).  *Id.*  Frontier contends that this provision is intended only to "shield[] those funds from the carrier's creditors in the event of bankruptcy" by disallowing an "*equitable* interest in them," and asserts that "the purpose of § 1510.11(b) is *not* to define what is a Fee and what is not."  Frontier Letter at 11 (emphasis added). But Section 1510.11(b) has a broader effect than Frontier contends as it prohibits an air carrier from asserting any equitable *or legal* interest in a collected Fee, and on the whole reinforces the understanding that air carriers cannot claim for themselves the Fees that they collect from passengers.

### 2)  An Expiring Credit Like Frontier's Credit Shell is Not a Refund of a Collected Fee.

At its core, Frontier's argument hinges on whether its issuance of an expiring credit shell to a passenger who cancels air transportation constitutes a refund of the Fee to that passenger, such that Frontier is not ultimately claiming as revenue for itself amounts collected solely by operation of Section 44940.  Frontier contends that TSA fails "to cite any authority that even hints that credit shells do not qualify as refunds," whereas it is aware of "a multitude of sources" that consider credit shells as refunds.  As examples of this, Frontier points to its internal accounting practices, its "agreement" with its

---

[10] Moreover, that tax refund provision would support Frontier only if it was an air carrier that had first "repaid the amount of such tax to the" passenger.  26 U.S.C. § 6415(a).  Frontier does not contend it has "repaid" the collected Fees to the passenger when creating a credit shell.

customers, Frontier Letter Ex.4 ¶ 5, the shorthand label that customers and others outside Frontier use in referring to credit shells, and case law regarding the excise tax provisions discussed above.  At bottom and as set forth more fully below, however, Frontier's contention that an expiring credit shell amounts to a refund amounts to a semantic game to generate a windfall for the air carrier, as it will have both availed itself of TSA's guidance about refunds (by "removing" the Fee amounts associated with the expiring credit from the overall amount of Fees that the carrier must remit to TSA at the end of the month) while still withholding that same amount from the passenger.  In that circumstance, the air carrier has not provided a refund consistent with the statutory, regulatory, and guidance language described above.

Frontier's contention that creating an expiring credit in the form of credit shell is a refund of the Fee cannot be squared with its regulatory obligations regarding the Fee.  As Frontier describes it, when issuing an expiring credit shell, it first "removes" any Fee amounts remitted to TSA for the canceled air transportation, and then places all sums collected from the passenger for that air transportation into an undifferentiated credit shell, which effectively comingles the airfare with any taxes and fees (and thus the Fee amounts that Frontier collected from the passenger when selling the ticket).  But the regulations make clear that "air carriers and foreign air carriers are responsible for the safekeeping of all security service fees from the time of collection to remittance."  49 C.F.R. § 1510.11(a)(emphasis added).  Further, carriers must hold collected fees "in trust…for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940."  *Id*. at § 1510.11(b).  And given the prohibition against a "direct air carrier or foreign air carrier hold[ing] . . . legal []or equitable interest in the security service fees" (except for the right to retain any accrued interest on the principal amounts collected)," *id*.  as well as their obligation to "account for [the Fees] separately" once they have been collected, *id.* at § 1510.11(c), Frontier is prohibited from merging or rebranding collected Fees with other funds when accounting for the Fee (even if it may temporarily keep the actual funds with other funds), and so may not eliminate the source or label of the Fee through the expediency of placing it in an undifferentiated (and expiring) credit shell.  Indeed, Frontier is required to account for the total amount of Fees "imposed on passengers in U.S. currency," the net amount of Fees "collected in U.S. currency by the . . . air carrier," the total amount of Fees "*refunded in U.S. currency by the . . . air carrier*," and the total amount "remitted in U.S. currency by the . . . air carrier."  49 C.F.R. § 1510.17(b)(1)-(5) (emphasis added).

Frontier likewise cannot credibly contend that its agreement with the passengers supersede the provisions of the Fee statute or TSA's interpreting regulations of that statute (or, by extension, the comporting guidance that TSA issues regarding the Fee).  Moreover, even if Frontier could contend that the passenger forfeited his or her right to *demand* a refund of the Fee from Frontier by having assented to Frontier's policies—which does not foreclose Frontier from offering a refund of the Fee that it collected—it does not follow from that consideration that Frontier is entitled to *retain* the Fee amounts because they simply "…ceased to exist" in Frontier's eyes once the customer cancelled

the ticket. Frontier Letter at 12.[11] The default position under the Fee statute is that the air carrier "shall" remit the Fees that it collects from passengers to TSA. 49 U.S.C. § 44940(e)(3). While TSA has offered an accommodation for air carriers to offset any amounts that the air carrier has refunded to passengers from the total amount of Fees collected in any given month, Frontier's approach to expiring credit shells essentially creates a windfall for the airline, as it has both availed itself of that accommodation (by immediately "recalling" from TSA the Fee amounts associated with a credit shell from the overall amount of Fees that it must remit) and then withheld that same amount from the passenger.

This expiring credit arrangement is not a refund of the Fee to the passenger in any material sense, as Frontier has not returned or repaid the Fee amount to the passenger, but has rather devised an arrangement whereby it can lay claim to it (in contravention of 49 U.S.C. § 1510.11(b)) by offering only a temporary expiring credit towards future travel. The examples described in the Frontier Letter where individuals may use the label of "refund" when referring to a credit shell —whether during internal discussion at Frontier, or even in the course of informal correspondence during the audit at issue here[12]—reflect a colloquial convenience that sheds little light on why Frontier's terms of carriage should supersede the plain text of Section 44940 and TSA's implementing regulations.

Frontier's reliance on a single court decision as emblematic of "case law" regarding refunds also does not warrant departure from this interpretation. The Frontier Letter points to *United Airlines, Inc. v. United States*, 111 F.3d 551 (7th Cir. 1997), in which the court upheld a jury's verdict that an air carrier was entitled to a refund of excise tax amounts that it had previously remitted to the government for tickets that were ultimately canceled. That ruling thus addressed a refund of sums that were actually transferred *by the carrier to the government*, under a different statutory regime, following a trial in which the government offered no case in opposition, and in which the appellate court applied the deferential standard of review applicable to jury verdicts. *Id.* at 553.[13] As such, that ruling is of limited persuasive value in this context and does not demonstrate that labeling a transaction as a refund precludes the government from considering whether actual money was returned to the customer. Despite its efforts to complicate the issues here, the simple answer to Frontier's request is that it is not entitled, either on a legal or equitable basis, to retain as revenue Fee amounts that it collects from its passengers who do not ultimately fly on the ticket for air transportation that generated the Fee in the first place; that money belongs to the United States if it is not refunded to the passenger. There is no statute, case, regulation, or guidance document that indicates otherwise.

---

[11] Frontier Letter Ex. 4 ¶ 5

[12] *See* Frontier Letter at 13-14.

[13] Moreover, United's unrebutted testimony showed that its accounting entries and netting transactions demonstrate that the full fare and excise tax were repaid to the customer, in contrast to the present context in which Frontier is both collecting and retaining the Fee amounts.

11

The positions underlying the audit's findings flow directly from the statutory text of Section 44940, as well as the regulatory provisions implementing that statute in 49 C.F.R. part 1510.  TSA's guidance in 2002, and again in 2020, is likewise clear that air carriers may not retain Fee amounts they collect from passengers under the auspices of Section 44940.  As such, all air carriers, including Frontier, had "fair warning" that liability could arise from its decision to place the Fee in an expiring credit shell when a passenger chose to cancel air transportation.[14]  What becomes of the airfare, taxes, and other fees (aside from the Passenger Fee) that were collected from the passenger when the non-refundable air transportation was purchased may be governed by other considerations, but Section 44940 is unambiguous that air carriers "shall" collect a Fee based on the itinerary when selling air transportation and "shall" remit those collections to TSA.  49 U.S.C. § 44940(e)(2), (3).

For these reasons, TSA upholds the audit's finding that Frontier should have remitted to TSA $5,377,584.15 of Passenger Fee collections.

This letter constitutes our final agency decision.  Pursuant to 49 U.S.C. § 46110, Frontier has 60 days to seek review of this decision in an appropriate United States Court of Appeals.  Because Frontier made a timely request for review of the liability set forth in the notification letter, no time has begun to accrue toward delinquency in TSA's view.  TSA will allow 30 days from the date of this letter before the liability in the notification letter is deemed delinquent, but not through final judgment in any judicial review process.

Sincerely,

Holly C. Mehringer
Assistant Administrator and Chief Financial Officer
Transportation Security Administration

Enclosures:

Frontier Letter dated January 14, 2021 (without attachments)
TSA 2002 Guidance Letter, TSA-2001-11120-0059
TSA 2020 Guidance Letter, TSA-2001-11120-0680
ATA Inquiry Letter, TSA-2001-11120-0057
TSA Audit Notification dated December 18, 2020

---

[14] This is corroborated by the fact that air carriers with similar policies regarding non-refundable air transportation do not withhold from TSA Fee amounts associated with canceled and unused travel credits. Frontier's contention that the TSA Guidance relating to Fees is not binding, quoting the Department of Justice, Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases (Jan. 25, 2018) Frontier Letter Ex. 8, does not serve to negate the fact that industry was given "fair warning" relating to this issue.

TSA Debt Collection Notice
TSA Invoice for Liability
TSA Remittance Instructions

TSA Invoice for Liability
TSA Debt Collection Notice
TSA Remittance Instructions

Optional Form 1114 (2-79)
Title 7, GAO MANUAL

# BILL FOR COLLECTION

Department, establishment, bureau or office receiving funds:

Department of Homeland Security
Transportation Security Administration
c/o U.S. Coast Guard Finance Center (OG)
1430A Kristina Way, Chesapeake, VA 23326

| | |
|---|---|
| Customer Account Number: | 6021-TSAAVD0094 |
| Invoice Number | PFDEC24DEC24D00094AU |
| Date of Invoice | 16-DEC-24 |
| Date Payment Due | 15-JAN-25 |

Bill to: Frontier Airlines
      4545 Airport Way
      Denver, CO 80239

| Order No. | Article or Services | Amount |
|---|---|---|
| | | (Dollars and Cents) |
| 1 | Passenger Civil Aviation Security Fee (September 11th Security Fee) | **$5,377,584.15** |
| | Audit Scope Period: July 1, 2016-December 31, 2018 | |
| | This invoice is pursuant to Federal Regulation 49 CFR Part 1510 | |
| | which provides for the compliance audit to verify that the security | |
| | fees have been properly collected, refunded, and remitted. | |
| | Original Amount | **$5,377,584.15** |
| | Amount Paid / Credited | $0.00 |
| | **Invoice Due Amount** | **$5,377,584.15** |

Agency Location Code:                         Project Number:

### Payment Instructions

1. For the September 11th Security Fee, see enclosed remittance instructions and Debt Collection Notice.
2. Interest, administrative charges and penalties will be assessed on all payments not received by due date.
3. If you have questions regarding payment method, please contact:

TSA
tsa-fees@tsa.dhs.gov

U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598-6014

## DEBT COLLECTION NOTICE

In addition to any civil enforcement actions TSA may take as described below, please be advised that if this debt is not paid in full within 30 days of the date of this letter, the debt will be also considered delinquent for debt collection purposes.

For delinquent debts, Federal law requires TSA to charge interest. The interest will be charged at the Treasury Current Value of Funds Rate, along with an administrative charge of $12.00 per month, representing the administrative costs of collection. Furthermore, if the amount assessed is not paid in full within 90 days of the date that the debt becomes delinquent, TSA is required to assess an additional collections-related penalty at an annual rate of 6%, accruing from the date of delinquency. In limited cases, TSA will consider written requests for the use of payment schedules, where justified by economic need and in the public interest. For your convenience, payment instructions are enclosed.

If TSA does not receive the full amount due and owing from the air carrier within 30 days of the date of this letter, TSA intends to enforce collection by taking one or more of the following actions:

(1) Administrative Offset -- Should the debt not be paid in full within 30 days, TSA will withhold any funds payable to your company to satisfy the debt.

(2) Treasury Department's Financial Management Service -- Debts that are delinquent for more than 60 days may be referred to the U.S. Department of Treasury for further collection action, including offset of Federal payments and tax refunds, or referral by the Department of Treasury to the U.S. Department of Justice for litigation. Debts that are delinquent for more than 120 days will be referred to the U.S. Department of Treasury for further collection action, including offset of Federal payments and tax refunds, or referral by the Department of Treasury to the U.S. Department of Justice for litigation.

(3) Private Collection Agency -- TSA may forward the debt to a private collection agency.

(4) Credit Bureau Reporting -- TSA may report the debt to commercial credit bureaus and consumer reporting agencies.

(5) Litigation -- TSA may refer the debt to the Department of Justice to initiate litigation to collect the debt.

(6) Federal loans or loan insurance or guaranties -- As required by 31 U.S.C. § 3720B and 31 C.F.R. § 901.6, the United States may decline to extend financial assistance in the form of a loan, loan guarantee, or loan insurance to any entity that is delinquent on a debt owed to a

Federal agency. The United States will not extend credit until after the delinquency has been resolved.

(7) Suspension or revocation of eligibility for licenses, permits, or privileges -- TSA may suspend or revoke licenses, permits or any other privileges for any inexcusable or willful failure of a debtor to pay a debt.

Please also be advised that in addition to pursuing debt collection action in the seven options above, TSA is authorized by 49 U.S.C. § 46301 and 49 C.F.R. § 1503.401 to impose a civil penalty against an air carrier for each day that the air carrier failed to remit a security service fee in accordance with 49 C.F.R. part 1510.  Pursuant to the Homeland Security Act of 2002, the maximum civil penalty is $37,377 per violation.  Each day that an air carrier fails to remit the required security service fee may constitute a separate violation.

Further, failure to remit the September 11th Security Fees may be considered an unfair and deceptive practice in violation of 49 U.S.C. § 41712, requiring referral to the U.S. Department of Transportation for enforcement action.  Finally, information concerning your company's failure to remit security service fees to TSA may be referred to the Department of Transportation's Air Carrier Fitness Division for appropriate consideration with respect to your company's fitness to hold a certificate of public convenience and necessity under 49 U.S.C. § 41102.

Additionally, you may address any correspondence by email at tsa-fees@tsa.dhs.gov or to:

> U.S. Transportation Security Administration
> Chief Finance Office, Revenue Division
> 6595 Springfield Center Drive, TSA-14
> Springfield, VA 20598-6014

# Security Fees
# Payment Instructions

Tel: 571-227-2323 / TSA-Fees@tsa.dhs.gov

Air carriers subject to the September 11 Security Fee will not receive an invoice and must initiate monthly payments to TSA according to regulation 49 CFR1510. Please follow any of the payment options below.

## Option A: Pay.Gov

Submit your payment securely online through Pay.Gov . Use direct withdrawl from a U.S. bank account (ACH debit in USD only). There is no fee for this transaction.

Step 1    Visit Pay.Gov to pay online if you already have TSA approved access to the September 11th Security Form.*
Step 2    Select "My Forms, Private" select "continue" to access the form "September 11th Security Fee."
Step 3    Select payment method "ACH Direct Debit" and continue to the form. Ensure your banking institution authorizes direct debit.
Step 4    Enter  the carrier name, contact information, payment and select payment date.
              Leave the reference number field blank, unless provided in written communication from TSA.   Select "Submit Data."
Step 5    Enter the account holder name, account type, routing number, account number.  Select "Submit Data."
Step 6    Check the box for the authorization and disclosure statement to finalize and submit your payment.

Be sure to print a copy for your records. If processing another payment, return to the available forms or log out to exit. You will receive an email notification from Pay.Gov once the payment is processed.

## Option B: Wire Transfer

Submit your payment through a wire transfer in USD. To initiate a wire transfer, you must provide the sending bank with the following instructions:

1.    {1510} Type-Subtype : 1000
2.    {2000} Amount: *Provide the USD payment amount. All banking fees are the responsibility of the sender as stipulated in 49 CFR 1510 and are not to deducted from remittance to TSA.*
3.    {3400} Receiver ABA routing number: 021030004 *(This is the routing symbol for the U.S. Treasury at the Federal Reserve Bank in New York)*
4.    {3400} Receiver ABA short name: TREAS NYC
5.    {3600} Business Function Code: CTR *(or CTP)*
6.    {4200} Beneficiary Identifier (account number): 70111001 *(This is the TSA Agency Location Code (ALC). Ensure that the sending bank enters this eight-digit number as shown. If the information is not populated correctly, the Fedwire will be returned.)*
7.    {4200} Beneficiary Name: DHS/TSA
8.    {4200} Beneficiary Address: 6595 Springfield Center Drive, Springfield, VA 20598-6014
9.    {5000} Originator: *Enter the name of the originator of the payment.*
10.  {6000} Originator to Beneficiary Information: *"*September 11th Security Fee", "Month", "Year", "Amount", and "Carrier Name". *This information is required to ensure that the payment is properly credited to your account.*
**************************The financial institution address for the U.S.Treasury's routing number is 33 Liberty Street, New York, NY 10045*************************

## Option C: Check or Money Order

You may pay with a check drawn from a U.S. bank or money order for fees less than $1,000 only. Mail to:

Standard
**U.S.  Department of Homeland Security**
**Transportation Security Administration**
**P.O. Box 979129**
**St. Louis, MO 63197-9000**

Overnight: Effective October 2023
**U.S. Bank Government Lockbox**
**3180  Rider Trail S.**
**Attn: Government Lockbox, LBX #979129**
**Earth City, MO 63045**

Please be sure to include the proper remittance advice including carrier name, fee month and year. Checks will be processed as an electronic funds transfer within 24 hours and will be shown in the account statement. TSA will keep a copy of the check and the original will be destroyed. TSA is authorized to process the copy in place of the orignal check if there are technical issues in processing. If the eletronic funds transfer cannot be completed due to insufficient funds, TSA may attempt the transfer up to two times. All banking fees are the responsibility of the air carrier.

* If you already have a Pay.Gov account, please email your username to TSA-Fees@tsa.dhs.gov to obtain access to the September 11th Security Fee Form. If you do not have a Pay.Gov account, please visit Pay.Gov to enroll, then email your username to TSA-Fees@tsa.dhs.gov to obtain access to the September 11th Form.



U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598-6014

# Air Carrier Administrative Review Request Letter

Miller & Chevalier

**Adam P. Feinberg**
**Member**
**(202) 626-6087**
**afeinberg@milchev.com**

January 14, 2021

<u>**Via Overnight Delivery and Via E-Mail (tsa-fees@dhs.gov)**</u>

Pamela McMenamin, Compliance Manager
Transportation Security Administration
Office of Revenue
6595 Springfield Center Drive
Springfield, Virginia  20598-6014

> Re:    Frontier Airlines' Request for Review of TSA's Claim of Liability Relating to
> September 11th Security Service Fees

Dear Ms. McMenamin:

Pursuant to 49 C.F.R. § 89.21, Frontier Airlines ("Frontier") respectfully requests review of the validity and amount of the $5,377,987.35 claim of liability made by the Transportation Security Administration ("TSA") against Frontier in connection with Frontier's collection and remittance of the September 11th Security Service Fee imposed on air transportation passengers (the "Fee").  A copy of that claim of liability, dated December 18, 2020, is attached as Exhibit 1 and is referred to herein as the "Claim."  A copy of the "Bill for Collection" accompanying the Claim is attached as Exhibit 2.  Frontier hereby disputes $5,377,584.15 of the purported liability in the Claim.  In accordance with 49 C.F.R. § 89.21(f)(1), Frontier has paid to TSA $403.20, representing the amount of the purported liability in the Claim that Frontier is not disputing.

The Claim is based on a review or audit of Frontier's compliance with the September 11th Security Service Fee statute, 49 U.S.C. § 44940 (the "Fee Statute") and TSA's regulations thereunder, 49 C.F.R. §§ 1510.1-1510.21 (the "Fee Regulations").  That review or audit (the "Audit") covers the period July 1, 2016, through December 31, 2018 (the "Audit Period").  The Audit culminated in a written audit report that was enclosed with the Claim and is attached hereto as Exhibit 3 (the "Audit Report").

The $5,377,584.15 of the purported liability in the Claim that Frontier disputes is based on 25 instances where customers cancelled their itineraries and never flew.  In such cases, TSA asserts that Frontier was required either to refund the Fees to the customer or to remit them to TSA, but that Frontier did neither.  For all but three of these 25 instances, Frontier issued to the customer the amount originally paid for the ticket (minus any applicable cancellation fee) in the form of a "credit shell," which could have been used for future Frontier travel services but which

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 2

eventually expired unused. TSA apparently believes such credit shells do not count as a refund. In the other three instances, Frontier would have issued such a credit shell had the credit due not already been used up by the customer to pay a cancellation fee owed to Frontier. TSA also contends that a customer's credit applied to pay a cancellation fee does not qualify as a refund.

TSA's position is wrong for two independent reasons. First, TSA has no authority to assess a Fee if the customer does not fly – that is, if the customer is not a "passenger" of an "air carrier" in "air transportation." 49 U.S.C. § 44940(a)(1). In each of the 25 instances at issue, the customer in question did not fly. Second, even if TSA were correct that a Fee is owed when the customer does not fly and the Fee is not refunded to the customer, no Fee was due for any of the 25 instances at issue because Frontier provided the customer a refund in the form of a credit shell or a credit against the cancellation fee owed by the customer, or both.

## Statutory, Regulatory, and Factual Background

### A.     The Fee Statute and Fee Regulations

In response to the terrorist attacks on September 11, 2001, Congress enacted the Aviation and Transportation Security Act, which established the TSA and charged it with maintaining civil aviation security. *See* 49 U.S.C. § 114. To cover the costs of certain security services, TSA was required to "impose a uniform fee[] on passengers of air carriers and foreign air carriers in air transportation and intrastate air transportation originating at airports in the United States." 49 U.S.C. § 44940(a)(1).

"[I]ntrastate air transportation" is defined as "transportation by a common carrier of passengers or property for compensation, entirely in the same State, by turbojet-powered aircraft capable of carrying at least 30 passengers." *Id.* § 40102(a)(27). "Air transportation" is not defined by statute. However, it is defined in the Fee Regulations to mean "continental interstate air transportation, continental intrastate air transportation, foreign air transportation, non-continental interstate air transportation, or non-continental intrastate air transportation," all of which, in turn, are defined as "the carriage by aircraft of persons for compensation or hire" in respective geographical areas. 49 C.F.R. § 1510.3.

The air carriers themselves, rather than TSA, must collect the Fees from passengers and then remit the Fees to TSA. 49 U.S.C. § 44940(e)(2), (3). Carriers remit Fees to TSA once a month, covering all Fees collected the preceding month. *See* 49 C.F.R. § 1510.13(a). Currently, and during the Audit Period, "Fees imposed . . . shall be $5.60 per one-way trip in air transportation or intrastate air transportation that originates at an airport in the United States, except that the fee imposed per round trip shall not exceed $11.20." 49 U.S.C. § 44940(c)(1).

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 3

**B.      Ticket Cancellations on Frontier**

When a passenger cancels a ticket, Frontier will either (1) credit the total amount paid (including airfare, taxes, and fees) to the customer's method of payment (typically a credit card) or (2) issue a credit shell in the total amount paid, typically minus any applicable cancellation fees.  Declaration of Heather Abbey ¶ 3 ("Abbey Declaration" or "Abbey Decl.").[1]  A credit shell is a customer-owned, dollar-denominated credit that can be used to purchase Frontier products and services.  *Id*. ¶ 4.  A credit shell can be used for air travel as well as other products and services offered by Frontier, such as bag fees, seat selection fees, pet fees, cancellation fees, and Discount Den® membership fees.[2]  *Id*. ¶ 4.

In accordance with Frontier's agreement with the customer, if the customer cancelled a ticket during the Audit Period, Frontier typically charged a cancellation fee of the lesser of $99 and the amount paid for the ticket (including airfare, taxes, and fees).  *Id*. ¶ 5; Audit Report, Finding Sheet at 3; Audit Report, Appendix III at 1.  The customer has option of paying that cancellation fee either with the credit that would otherwise be issued as a credit shell or with a separate method of payment.[3]  Abbey Decl. ¶ 5; Audit Report, Finding Sheet at 3.  Under either option, there are two separate transactions that occur when a ticket is cancelled in exchange for credit.  *Id*. ¶ 6.  The first is the credit to which the customer is entitled, which equals the full amount paid for the ticket including airfare, taxes, and fees.  *Id*.  The second is the cancellation fee which, again, was $99 during the Audit Period.  *Id*.  If the customer choses to pay the cancellation fee with the credit, Frontier offsets the full credit amount by the cancellation fee and issues only the remainder as a credit shell.  *Id*.  Even though the two amounts are offset against one another, they are two separate and distinct transactions (just as if the customer had chosen to pay the cancellation fee with a separate method of payment) and Frontier's books and records reflect them as such.  *Id*.  Thus, for example, it is easy to see in Frontier's books and records both the full amount of the customer's credit and the offsetting cancellation fee, as well as any amount issued as a credit shell (which will equal the difference between the two).  *Id*.

When a ticket is cancelled, Frontier accounts for the cancellation transaction in the same manner regardless of whether Frontier issues a method-of-payment refund or credit.  *Id*. ¶¶ 3, 7.  In either case, all of the accounting entries associated with the sale of the ticket are reversed entirely.  *Id*. ¶ 7.  At that time, there is no airfare, taxes, or Fees and the funds at issue are no longer identified in Frontier's records as such.  *Id*.  As part of reversing the transaction when a

---

[1] The Abbey Declaration is attached hereto as Exhibit 4.

[2] Discount Den® is a subscription service that gives customers access certain benefits, including exclusive access to special fares.  Abbey Decl. ¶ 4.

[3] During the Audit Period, customers also had a third option if they did not want to use their tickets.  They could not affirmatively cancel the ticket and, instead, simply fail to show up for the flight.  Abbey Decl. ¶ 5; Audit Report, Finding Sheet at 3.  In such cases, the customer was not entitled to a credit of any kind.  *Id*.  This option is not at issue in this request for review.  *Id*.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 4

ticket is cancelled in exchange for either a method-of-payment refund or credit, Frontier removes the amount of the Fee from its TSA Fee Liability Account by classifying that amount as a "refund," which results in those funds not being paid to TSA.  *Id.*; *see also* Audit Report, Finding Sheet at 2-3.  If a credit shell is issued as part of a ticket cancellation, the credit shell is recorded as a liability in Frontier's books and records.  Abbey Decl. ¶ 4.

When a customer uses a credit shell to purchase a new ticket, the value of that credit shell is applied to the new purchase just as if it were a cash purchase.  *Id.* ¶ 8.  Among other things, when a credit shell is used to buy a new ticket, Frontier collects any Fees applicable to the ticket from the credit shell and remits the Fees to TSA at the appropriate time.[4]  *Id.*; *see also* Audit Report, Finding Sheet at 3.  That is, a credit shell can (and often is) used in part by customers to pay Fees.  Abbey Decl. ¶ 8.  If a credit shell expires unused, Frontier thereafter recognizes the amount of the unused credit shell as revenue.  *Id.* ¶ 9; *see also* Audit Report, Finding Sheet at 3.  Thus, TSA receives no Fees when a ticket is cancelled in exchange for a credit shell and the credit shell later expires unused.  Abbey Decl. ¶ 9; *see also* Audit Report, Finding Sheet at 3.  The same is true if a ticket is cancelled in exchange for a credit shell and the credit shell is used to pay for non-flight products or services from Frontier, such as bag fees, seat selection fees, pet fees, cancellation fees, and Discount Den® membership fees.  Abbey Decl. ¶ 9.

## C.     TSA's Claim and the Audit Report

TSA's Claim is based on a review or audit that was conducted on TSA's behalf by U.S. Customs and Border Protection ("CBP").  *See* Claim at 1; Audit Report at 1.  TSA stated that the Audit was authorized by 49 C.F.R. §1510.19.  *See* Claim at 1.  The total purported liability "determined during the review was $5,377,987.35."  *Id.*  In the Claim, TSA stated that it was accepting CBP's audit findings "as evidence of a liability for September 11th Security Fees due to TSA for the audit period of July 1, 2016 through December 31, 2018."  *Id.*  As noted above, the Claim enclosed a copy of CBP's Audit Report.  The Claim and does not contain any other explanation of the purported liability.

CBP reviewed five separate areas, and recommended a liability against Frontier for two of those.  *E.g.*, Audit Report at 3-5.  In one of those areas – the "General Ledger Review" – CBP recommended a liability against Frontier in the amount of $403.20.  *Id.* at 3, 5.  Frontier does not challenge that liability and has already paid it.  In another area of the audit – the "PNR Sample" – CBP recommended a liability against Frontier in the amount of $5,377,584.15.  *Id.*  Frontier disputes that aspect of the Claim and Audit Report in its entirety.

---

[4] The number of Fees collected and remitted on tickets purchased with a credit shell might be greater or fewer than the number of Fees originally collected on the ticket that was cancelled in exchange for the credit shell.  Abbey Decl. ¶ 8.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 5

In the PNR Sample, CBP "selected a sample of 500 PNRs." *Id.* at 2. A PNR, or "passenger name record," is a travel itinerary involving planned travel by one or more customers. Abbey Decl. ¶ 11. These 500 itineraries were made up of 1,151 qualifying one-way trips, *i.e.*, a one-way trip for a single customer on which TSA maintains a $5.60 Fee should have been collected and remitted.[5] Audit Report at 3; *id.*, Finding Sheet at 2. CBP reviewed each of these 500 itineraries for compliance with the Fee Regulations and classified as an "error" any instances when a Fee supposedly was not properly imposed on and collected from the customer or remitted to TSA. *See* Audit Report at 2; *id.*, Finding Sheet at 2-3 & Attachments A & B. CBP "did not identify any errors related to imposition and collection for the 500 PNR sample items." *Id.* at 3. Yet, CBP claimed it found 25 "errors" relating to Frontier's remittance of Fees that it had collected from passengers. *See id.* at 2-3; *id.*, Finding Sheet at 2-3 & Attachments A & B. CBP used those supposed "errors" to compute an "error rate" of 2.172% and then applied that rate across Frontier's entire population of Fee remittances during the Audit Period to extrapolated a purported liability of $5,377,584.15. *Id.*

Each of the 25 supposed errors in the PNR Sample involves a situation where Frontier originally collected a Fee from the customer but where the customer cancelled the travel for which that Fee had been collected and where Frontier did not remit the Fee amount to TSA. *See* Abbey Decl. ¶ 11; Audit Report, Finding Sheet at 2-3. Each of 25 supposed errors represents what would have been a single qualifying one-way trip for a single customer. *See* Abbey Decl. ¶ 11; Audit Report, Finding Sheet at 2-3. These 25 qualifying one-way trips involve 12 itineraries and 15 people. Abbey Decl. ¶ 11; Audit Report, Finding Sheet, Attachment A.

The 12 itineraries that constitute the 25 supposed errors involve two slightly different scenarios. Abbey Decl. ¶ 12; Audit Report, Finding Sheet at 2-3 & Attachment A; *id.*, Appendix III at 1. The first involves three of the itineraries (consisting of three qualifying one-way trips) where the customer cancelled the itinerary and was therefore entitled to a credit in the full amount of the ticket price (including airfare, taxes, and fees), but where no credit shell was issued because the customer chose to pay the cancellation fee with the credit and, after doing so, there was no credit remaining to be issued as a credit shell. Abbey Decl. ¶ 12; *see also* Audit Report, Finding Sheet at 2-3 & Attachment A; *id.*, Appendix III at 1. The second scenario involves the remaining nine itineraries (consisting of 22 qualifying one-way trips). Abbey Decl. ¶ 12; *see also* Audit Report, Finding Sheet at 2-3 & Attachment A; *id.*, Appendix III at 1. In each case, the customer (1) cancelled the itinerary, (2) was therefore entitled to a credit in the full amount of the ticket price (including airfare, taxes, and fees), (3) paid the cancellation fee with

---

[5] A one-way trip means continuous air transportation without a stopover. *See* 49 C.F.R. § 1510.3 (definition of "one-way trip"). Some itineraries involve more than one one-way trip and/or more than one person. A single itinerary for a single person might have multiple one-way trips, such as a roundtrip ticket between Denver and Baltimore, which consists of two one-way trips (one from Denver to Baltimore, and one from Baltimore to Denver). The number of one-way trips matters because the $5.60 Fee applies to each one-way trip, except that total Fees for a round trip cannot exceed $11.20. *See* 49 U.S.C. § 44940(c)(1); 49 C.F.R. § 1510.5(a).

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 6

the resulting credit, (4) was then issued a credit shell for the remainder, but (5) did not use the credit shell so it expired unused.  Abbey Decl. ¶ 12; *see also* Audit Report, Finding Sheet at 2-3 & Attachment A; *id.*, Appendix III at 1.  CBP contends that each of the 25 supposed errors represents an instance where Frontier was obligated to either refund a Fee to the customer or remit it to TSA but where Frontier did neither.  *See, e.g.*, Audit Report, Finding Sheet at 2-3 & Attachment A; *id.*, Appendix III at 1.

Although the Audit Report does not mention it, five of the 500 itineraries in the PNR Sample were cancelled in exchange for credit shells (after payment of a cancellation fee) where the credit shells were actually used by the customer subsequently.  *See* Abbey Decl. ¶ 13.  TSA and CBP did not consider any of those to be an "error" in the Audit and they are not reflected as "errors" in the Audit Report.  *Id.*

TSA has also conducted other, similar audits of Frontier's Fee compliance.  *Id.* ¶ 14.  For example, TSA conducted an audit of Frontier's Fee compliance for the two and half year period immediately preceding the Audit Period.  *Id.*  TSA's final assessment ("Prior Assessment") and the audit report enclosed therewith ("Prior Audit Report") are attached hereto as Exhibit 5.  That prior audit was conducted by TSA itself, not CBP, but otherwise was similar in scope, nature, and technique to the Audit at issue here.  Abbey Decl. ¶ 14.  As with the Audit, the prior audit involved a review by the government auditors of hundreds of Frontier tickets "to ensure the proper imposition and collection of the September 11th Security Fees," to verify that Frontier's Fee "remittances" were accurate, and, notably, to verify "that any refunds of the September 11th Security Fees identified during the review were processed correctly."  Ex. 5, Prior Audit Report at 2.  Numerous tickets reviewed by TSA in the prior audit presented the same exact two scenarios as the supposed "errors" in this Audit, *i.e.*, cancelled itineraries where Frontier (1) originally collected a Fee amount from a customer, (2) upon ticket cancellation, removed the amount of the Fee from its TSA Fee Liability Account by classifying that amount as a "refund," resulting in the funds not being paid to TSA, (3) included the Fee amount in credit to the customer, and then (4) applied that credit either to the customer's cancellation fee or to both the customer's cancellation fee and a credit shell that later expired unused.  Abbey Decl. ¶ 14.  Yet, TSA did not treat a single one of those tickets as errors, leading Frontier to believe there was nothing wrong with the way it handled those situations.  *Id.*

## D.    TSA's Theory of Liability

As noted above, in the Claim and Audit Report, TSA and CBP take the position that if a Fee collected on a cancelled ticket is not refunded to the customer, the Fee must be remitted to TSA, even if the customer never engaged in air transportation.  *E.g.*, Audit Report, Finding Sheet at 3; *id.*, Appendix I at 1-2; *id.*, Appendix III at 1.  TSA and CBP also take the position that neither use of a credit to pay a cancellation fee nor expired credit shells qualify as refunds.  *E.g., id.*  On the first point, TSA and CBP rely on a letter from TSA dated November 21, 2002, to the Air Transport Association (now called Airlines for America), an airline trade association.  *Id.*, Finding Sheet at 2; *id.*, Appendix I at 1-2; *id.*, Appendix III at 1.  A copy of the letter is attached

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 7

hereto as Exhibit 6 and is referred to herein as the "Guidance Letter." TSA informed Frontier of much of the substance of the Guidance Letter via a letter from TSA to Frontier dated August 30, 2018, and that August 30, 2018 letter is included as Appendix I to the Audit Report. *See id*., Finding Sheet at 2; *id*., Appendix I at 1-2. In that August 30, 2018 letter, TSA also told Frontier that "Frontier's creation of a credit to the passenger that later expires is not a refund of the [Fee] to the passenger." *See id*., Appendix I at 2; *see also id*., Finding Sheet at 2. The August 30, 2018 letter from TSA to Frontier was the first time Frontier learned of the Guidance Letter, of TSA's position that Fees collected on cancelled tickets must either be refunded to the customer or paid to TSA, or of TSA's position that credits that later expire do not qualify as refunds to customers. Abbey Decl. ¶ 15. Frontier is not, and has never been, a member of the airline trade association to which the Guidance Letter was addressed. *Id*.

The Guidance Letter addresses the refundability of the Fee "to ticket purchasers who do not travel on their scheduled flights, particularly where the tickets are nonrefundable and have no value toward future travel." Guidance Letter at 1. The Guidance Letter explains that if a carrier remits a Fee "to TSA and then refunds the [F]ee to a ticket purchaser, the carrier may offset the refund by deducting it from the [Fees] remitted to TSA for the month in which the refund is provided." *Id*. at 2. But, the Guidance Letter asserts, if "an air carrier does not refund [the Fees] to the ticket purchaser, the [F]ees must be remitted to or remain with TSA." *Id*. The Guidance Letter does not explain what qualifies as a "refund."

The Audit Report (*id*., Finding Sheet at 1) and the Guidance Letter rely on one of the Fee Regulations, which states:

The security service fee must be based on the air travel itinerary at the time the air transportation is sold. Any changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate.

49 C.F.R. § 1510.9(b). The Guidance Letter cites no other legal authority.

The Audit Report (*see id.*, Finding Sheet at 2; *id*., Appendix III at 2) also relies on 49 C.F.R. § 1510.11(b) which states:

Security service fees collected by a direct air carrier or foreign air carrier are held in trust by that direct carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940. The direct air carrier or foreign air carrier holds neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected pursuant to § 1510.13(b).

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 8

<u>**Argument**</u>

To the extent based on the PNR Sample, the Claim is meritless and should be withdrawn for two independent reasons.  First, TSA has no authority to assess Fees if the customer does not fly and here, in all 25 one-way trips that make up the supposed "errors," the customer did not fly.  Second, even if TSA were correct that a Fee is owed when the customer does not fly and the Fee is not refunded to the customer, no Fee is owed to TSA for any of the 25 one-way trips at issue because when the customers cancelled the tickets, Frontier provided the customers with a full refund of all amounts paid (including any Fee amounts) in the form of a credit applied against a cancellation fee, a credit shell, or both.  We address these two main issues in Sections A and B below.  Then, in Section C, we address an alternative argument:  if this request for review is denied, TSA should suspend the delinquency date for the supposed debt until after Frontier has an opportunity to obtain judicial review of TSA's decision.

**A.    The Fee Statute Does Not Allow TSA to Collect Any Amount Where the Customer Has Not Flown**

TSA has authority to collect a Fee only if a customer actually engages in air transportation.  If a customer cancels his or her ticket or otherwise does not fly – as is the case with each of the 25 one-way trips making up the supposed "errors" – TSA has no authority to collect any amount.

An agency cannot act contrary to a statute and "must give effect to the unambiguously expressed intent of Congress."  *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc*., 467 U.S. 837, 843 (1984); *see also* 5 U.S.C. § 706(2)(A) (agency action that is "not in accordance with law" must be set aside by a reviewing court).

Nor can an agency act without authority from Congress.  "Agencies are creatures of Congress; 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'"  *City of Arlington v. FCC*, 569 U.S. 290, 317 (2013) (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)).  That Congressional authority must be express and "the absence of a statutory prohibition cannot be the source of agency authority."  *FAG Italia, S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002) ("no case of which we are aware holds that an administrative agency has authority to fill gaps in a statute that exist because of the absence of statutory authority").  Congress does not give an agency "plenary authority to act within a given area simply" by giving the agency some authority to act in that area.  *Ry. Labor Executives' Ass'n v. Nat'l Mediation Bd*., 29 F.3d 655, 670 (D.C. Cir. 1994); *see also FAG Italia*, 291 F.3d at 817 ("The fact that [the agency] is empowered to take action in certain limited situations does not mean that [it] enjoys such power in other instances.").  Because Congress gave TSA authority to collect funds under the Fee Statute only when the customer actually engages in air transportation, TSA's attempt to collect amounts when the customer does not fly is unlawful and must be rejected.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 9

1.      **The Plain Language of the Fee Statute and Fee Regulations Do Not Allow TSA to Collect Fees When the Customer Cancels the Ticket and Never Flies**

As noted above, the Fee is imposed "on passengers . . . in air transportation."  49 U.S.C. § 44940(a)(1); *see also id.* § 44940(c)(1) (the Fee "shall be $5.60 per on-way trip in air transportation"); 49 C.F.R. § 1510.1 ("fee to be paid by passengers . . . in air transportation"); *id.* § 1510.5 (carriers shall impose a "fee of $5.60 per one-way trip for air transportation").  As also noted above, the Fee Regulations provides a precise definition of "air transportation":  "the carriage by aircraft of persons for compensation or hire."  *Id.* § 1510.3.  There is no authority for TSA to collect any amount unless there is a "passenger" and unless that passenger has actually engaged in "air transportation" by being "carri[ed] by aircraft."  When there is no passenger or no air transportation, TSA lacks any statutory and regulatory authority to collect any funds.

This conclusion is separately mandated by the Fee Statute's requirement that the Fee be used only "to pay for" certain "costs of providing civil aviation security services," such as salary, background checks, and training for screening personnel, the cost of the air marshals program, and the cost of training pilots and flight attendants.  49 U.S.C. § 44940(a)(1).  There are no such costs for a customer who cancels his or her ticket and never boards a plane.

Likewise, the Fee must be "reasonably related to [TSA's] costs of providing services rendered."  *Id.* § 44940(b).  Again, if the customer did not engage in air transportation, no services were rendered by TSA to that customer.  Consequently, any Fee would be unreasonable and unauthorized by the Fee Statute for this additional reason.

Given the plain language of the Fee Statute, it is not surprising that both TSA and the U.S. Court of Appeals for the District of Columbia Circuit have concluded that "no [F]ees had ever been incurred" where the customer had "never used the purchased ticket."  *Alaska Airlines, Inc. v. TSA*, 588 F.3d 1116, 1122-23 (D.C. Cir. 2009); *accord* Brief of the Respondent at 38, *Alaska Airlines, Inc. v. TSA*, No. 09-1062 (D.C. Cir. Aug. 24, 2009) (attached hereto as Exhibit 7) ("no fees have ultimately been incurred" where the passenger "did not follow through with travel plans, never used the purchased ticket, and thus did not ultimately incur a fee liability").

Because TSA has no authority to collect a Fee if there is no actual passenger who travels on a plane, none of the 25 supposed errors can serve as the basis of any Fee liability.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 10

       **2.**      **Nothing in § 1510.9(b) of the Fee Regulations Obligates a Carrier to Pay Any Amount to TSA When Customers Do Not Fly and, If Read As Proposed in the Guidance Letter and the Audit Report, the Regulation Would Conflict With, and Exceed the Authority Granted By, the Plain Language of the Fee Statute**

As noted above, in both the Guidance Letter and the Audit Report, TSA and CBP rely on 49 C.F.R. § 1510.9(b), which, again, states: "The security service fee must be based on the air travel itinerary at the time the air transportation is sold. Any changes by the passenger to the itinerary are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier, as appropriate." That regulation cannot support the conclusion in the Guidance Letter or the Claim. First, even assuming for the moment that this regulation requires a carrier to refund Fees on cancelled tickets to the customer (and it does not), nothing in that regulation states that a carrier must pay anything to TSA if the carrier violates that obligation. That is, even if Frontier *arguendo* violated this provision by failing to give the customer a refund, TSA has no authority to seize from Frontier the amounts that TSA claims should have been refunded to the customer. The Fee Regulations have a provision entitled "Enforcement," but that provision does not authorize TSA to collect any amounts other than Fees properly owed under the Fee Statute and Fee Regulations, which is not the case here. *See* 49 C.F.R. § 1510.21.

Second, and more importantly, even if 49 C.F.R. § 1510.9(b) were read (incorrectly) as suggested by the Guidance Letter and the Audit Report, the regulation would be invalid because it would conflict with, and exceed the authority granted by, the Fee Statute which, as established above, authorizes TSA to receive funds only when a passenger flies, *i.e.*, engages in air transportation.

Relatedly, neither the Guidance Letter nor TSA's August 30, 2018 letter to Frontier is binding on anyone for any purpose. Indeed, the U.S. Department of Justice would not rely on them in pursuing enforcement actions. *See* U.S. Department of Justice, Limiting Use of Agency Guidance Documents in Affirmative Civil Enforcement Cases (Jan. 25, 2018) (attached as Exhibit 8). And, as stated above, Frontier had no knowledge of either letter until August 30, 2018 – after 26 of the 30 months in the Audit Period had already passed. Further, during TSA's Fee audit of Frontier for the period immediately prior to the Audit Period, TSA reviewed tickets involving the same two scenarios as the supposed "errors" here but did not treat any of them as errors. Neither the Guidance Letter nor TSA's August 30, 2018 letter to Frontier is the law. The law – that is, the Fee Statute and Fee Regulations – imposes no duty on carriers either to refund Fees to customers when tickets are cancelled or to remit those amounts to TSA.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 11

That point is reinforced by the fact that Congress plainly knows how to craft a statute requiring a carrier to give the customer a refund. Congress did exactly that, for example, with respect to the federal excise tax on air transportation found at 26 U.S.C. § 4261. *See id.* § 6415(a) (providing that a carrier that collected the tax from a customer can obtain a refund of that tax only if the carrier "has repaid the amount of such tax to the person from whom [the carrier] collected it, or obtains the consent of such person to the allowance of such credit or refund"). The Fee Statute contains no such provision, however, even though Congress was well aware of the § 4261 excise tax when drafting the Fee Statute, as evidenced by the fact that the Fee Statute explicitly mentions the § 4261 tax. *See* 49 U.S.C. § 44940(e)(5). Moreover, the Fee Statute does contain a provision allowing for refunds by TSA of "any fee paid by mistake or any amount paid in excess of that required." *Id.* § 44940(g). But that section – like the rest of the Fee Statute – contains no requirement that a carrier refund any amounts to the customer.

**3.      If Read As Proposed in the Audit Report, § 1510.11(b) of the Fee Regulations Would Conflict With, and Exceed the Authority Granted By, the Plain Language of the Fee Statute, and, In Any Event, Neither a Credit Shell Nor the Application of the Customer's Credit to Pay a Cancellation Fee Is "Fee"**

As noted above, CBP and TSA also rely on 49 C.F.R. § 1510.11(b). Again, 49 C.F.R. § 1510.11(b) states that Fees collected by a carrier "are held in trust" by the "carrier for the beneficial interest of the United States" and that the "carrier holds neither legal nor equitable interest in the" Fees (except for the right to keep the interest thereon). 49 C.F.R. § 1510.11(b). According to the Audit Report, "Frontier has created an equitable interest in the principle amount" because it retained "fees collected on behalf of TSA and recogniz[ed] those fees as revenue." Audit Report, Appendix III at 2. This argument fails as both a legal and a factual matter.

On the law, § 1510.11(b) simply cannot override, or exceed the authority granted to TSA by, the Fee Statute. Again, the Fee Statute permits TSA to obtain funds only when the customer actually engages in air transportation. Once the customer cancels the ticket and no longer has any right to engage in air transportation, there cannot be any "Fee" and TSA cannot be entitled to any funds.

As with other similar provisions in the law, the clear intent of § 1510.11(b) is to protect the United States' interests in taxes or fees between the time they are collected by the statutory collector (here, air carriers) and the time they are remitted by the collector to the government. In particular, the fact that the collector holds the funds in trust and does not have an equitable interest in them shields those funds from the collector's creditors in the event of a bankruptcy or other insolvency. *See, e.g., Begier v. IRS*, 496 U.S. 53 (1990) (taxes collected by the debtor and held in trust for the United States are not part of the bankruptcy estate). But the purpose of § 1510.11(b) is *not* to define what is a Fee and what is not. It merely states that *if* an amount is a Fee, then it is held in trust for the United States and the carrier has no equitable interest. Because

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 12

no Fee is possibly owed once a ticket is cancelled and the customer has no right to air transportation, § 1510.11(b) has no application here.

CBP's argument also fails as a factual matter. Even if a Fee theoretically could exist in connection with a cancelled ticket (and it cannot), under the facts of this case there is no longer any Fee associated with any of the 25 one-way trips that make up the supposed "errors" once the ticket was cancelled and the value that once made up the ticket price is applied to a cancellation fee, issued as a credit shell, or both. The Audit Report erroneously assumes that the amounts originally collected as Fees continue to be properly characterized as Fees even after the ticket is cancelled and the funds are used to pay a cancellation fee or issued as a credit shell. *See* Audit Report, Appendix III at 1-2. That is wrong. As noted above, once the ticket is cancelled, all of the components of the purchase price – the airfare, taxes, and Fees – cease to exist. *See* Abbey Decl. ¶ 7. Instead, at the time the ticket is cancelled, those accounting entries from the ticket purchase are all reversed and all that exists is a credit that is applied to the cancellation fee or issued as a single liability to the customer in the form of the credit shell that the customer can use as he or she likes, or both. *Id*. If and when a credit shell later expires and Frontier takes the funds at issue as revenue, Frontier takes an interest not in Fees but rather in a cash-equivalent asset that, until that time, belonged solely to the customer. The same is true of the cancellation fees that Frontier receives. Frontier never takes any interest in any Fees. The Fees ceased to exist once the customer cancelled the ticket.

Under TSA's theory, the trust purportedly created by 49 C.F.R. § 1510.11(b) continued to attach to the funds at issue even though they were used to pay a cancellation fee or were applied to the customer's credit shell and even though no ticket for a flight to which the Fee applied existed anymore. According to the Audit Report, "[t]he determination as to whether a credit shell constitutes a refund of any collected TSA Security Fees cannot be made until the credit shell either expires unused or is used to purchase new transportation as the use or expiration of the credit shell is what creates an equitable interest in the fees." Audit Report, Appendix III at 2. That is wrong for at least two reasons. First, there is a completed transaction at the time the ticket is cancelled. It is incongruous for CBP to say that, at that time, it is impossible to know whether a refund has in fact been given. Second, CBP makes no effort to explain how the trust could ever cease where the credit shell is used for something other than transportation. Take for example a customer who cancels a ticket to which a Fee applied, receives a credit shell that includes the amount of the Fee, and then uses the entire credit shell to pay for bag fees, meaning the customer has received the full benefit of every dollar originally spent on the ticket, including airfare and Fees. TSA, meanwhile, would not receive any Fee in connection with the entire series of transactions involving that customer. Under CBP's apparent theory, the trust apparently would continue because the funds were not "used to purchase new transportation." *Id*. That makes no sense.

For these reasons, it is improper for TSA to assess any Fee liability when the customer has not flown, which is precisely what the Audit Report and the Claim seek to do in assessing the $5,377,584.15 liability associated with the PNR Sample.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 13


B.    **Credit Applied to Cancellation Fees and Credit Shells Are Both Refunds to Customers**

The second fundamental flaw in the Claim and Audit Report is that credit applied to a cancellation fee or issued to a credit shell qualify as "refunds" as soon as the cancellation fee is paid or the credit shell is issued.  Nothing in the Fee Statute, the Fee Regulations, or the Guidance Letter defines what qualifies as a "refund" or remotely suggests that refunds cannot be given in the form of credit shells or other forms of credit.  TSA and CBP concede that credit shells that are used by the customers qualify as refunds, because they are not treated as errors in the Audit Report.  But TSA and CBP are wrong when they claim that neither credit applied to a cancellation fee nor unused credit shells qualify as refunds.

As stated above, the accounting treatment of a cancelled ticket is exactly the same regardless of whether the customer receives a form-of-payment refund or a credit shell.  The entire ticket transaction is reversed and, in either event, the full value of the ticket (including airfare, taxes, and Fees) is returned to the customer.  The fact that such value is returned in the form of credit that is then used to pay a cancellation fee or issued to a credit shell does not change that.

Case law also supports the conclusion that credit applied to cancellation fees or issued as credit shells are "refunds."  Disputes about what qualifies as a refund of airline ticket taxes have occurred in connection with the federal excise tax on air transportation found at 26 U.S.C. § 4261.  That is because, as noted above, the law allows a carrier to seek a refund of such tax only in limited circumstances, including when the carrier "has repaid the amount of such tax to the person from whom he collected it."  *Id*. § 6415(a).  *United Airlines, Inc. v. United States*, 111 F.3d 551 (7th Cir. 1997), involved a dispute about whether "United refunded the full amount of the tax it had collected from the customer" so as to comply with § 6415(a).  *Id*. at 552.  In that case, customers had cancelled their tickets and were subject to penalties from the airline for doing so.  If the ticket was for travel from the continental United States to Hawaii, the penalty was 100% of the amount paid for the ticket, including taxes and fees.  The penalties were automatically deducted from the refunds given to the customers.  Thus, customers subject to the 100% penalty received no money back at all after they cancelled their tickets.  Nonetheless, the court held that refunds were in fact given because the refund and the imposition of the penalty were two separate transactions.  This is exactly what happened here on the three supposed "errors" where the customer received nothing upon cancellation of the ticket because the credit to which the customer was entitled based on the amount paid for airfare, taxes, and fees was entirely used up to pay the cancellation fee owed by the customer.

For two separate reasons, the same logic also applies to the other 22 supposed errors where credit shells expired unused.  First, in each of those instances, the customer was entitled to a credit in the full amount of the ticket price (including airfare, taxes, and fees) and used a portion of that credit to pay a cancellation fee, with the amount so used exceeding the amount

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 14

originally paid in Fees. *See* Abbey Decl. ¶ 12. Thus, regardless of what later happened to the remaining value issued as credit shells, the customers had already received a refund in the form of the credit applied to their cancellation fees, just as occurred in the *United Airlines* case. Second, the customers also received a refund in the form of the credit shell itself, with that amount also exceeding the amount originally paid in Fees. Abbey Decl. ¶ 12. The issuance of the credit shell when the ticket is cancelled and the potential eventual expiration of the credit shell are two separate transactions. *See id.* ¶ 10. If anything, the logic in *United Airlines* applies to credit shells with even more force because Frontier's issuance of the credit shell and the eventual expiration of that credit shell are separated in time (unlike the refund and simultaneous penalty in the *United Airlines* case). Moreover, Frontier's customers actually have the ability to use the credit shells to purchase new tickets or other services. In fact, many customers do exactly that, as evidenced by the fact that five itineraries in the PNR Sample were cancelled in exchange for credit shells (after payment of a cancellation fee) that were actually used by the customer.

Further, the IRS has repeatedly stated that credits of various sorts qualify as "refunds." *See, e.g.*, Rev. Rul. 70-13, 1970-1 C.B. 272 (holding that a credit to a customer's capital account qualified as a refund under 26 U.S.C. § 6415(a)); Rev. Rul. 89-109, 1989-2 C.B. 232, 233 ("This holding is equally applicable to a situation in which a carrier allows the passenger a refund by credit rather than by cash."); Rev. Proc. 2011-17, 2011-1 C.B. 441 (in connection with a customer returning merchandise, allowing the store to treat the issuance of a gift card to the customer as the equivalent as a cash refund). CBP dismissed such authorities because "citation of Internal Revenue language are not applicable to the TSA Security Fee." Audit Report, Appendix III at 2. That might be true in a purely technical sense, but the concepts at issue are identical and CBP offers no reason why the term "refund" should have different meanings under the federal tax and Fee regimes.

Because a credit qualifies as a refund to the customer as soon as it is used to pay a cancellation fee or is issued as a credit shell, the entire $5,377,584.15 liability associated with the PNR Sample – which is predicated on Frontier's alleged failure to have provided refunds – is improper for this second, independent reason.

Separately, even if the Audit Report were correct that for cancelled tickets (1) a carrier is required either to refund the Fee to the customer or to pay it to TSA, and (2) application of credit to pay a cancellation fee or to a credit shell that expires do not qualify as refunds (and neither of those is correct), no liability should be imposed in this case because TSA did not give Frontier fair notice of these interpretations. *See, e.g., Univ. Med. Ctr., Inc. v. Sebelius*, 856 F. Supp. 2d 66 (D.D.C. 2012). Agencies cannot enforce regulations that do not "give an adequate warning of what they command or forbid." *Diebold, Inc., v. Marshall*, 585 F.2d 1327, 1334-35 (6th Cir. 1978). Unless "a regulated party acting in good faith would be able to identify, with 'ascertainable certainty,' the standards with which the agency expects parties to conform," the regulated party cannot be held liable. *General Elec. Co. v. EPA*, 53 F.3d 1324, 1329 (D.C. Cir. 1995).

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 15

Here, the period at issue is July 1, 2016, through December 31, 2018. Yet, until August 30, 2018, TSA had never given Frontier any notice of the two positions described in the previous paragraph and, as far as Frontier knows, had never given any air carriers notice of any aspect of the second position. Abbey Decl. ¶ 15. Prior to August 30, 2018, the only guidance TSA had given on the subject of "refunds" is the Guidance Letter, but that letter offers no definition or explanation of what is meant by the term. *See* Guidance Letter (Exhibit 6). Frontier had no notice of TSA's position that application of credit to pay a cancellation fee does not qualify as a refund until the government auditors informed Frontier of that position in the course of the Audit in 2020. Abbey Decl. ¶ 15. Lack of such notice is particularly meaningful in light of the *United Airlines* decision establishing a rule contrary to TSA's position in this regard. Further, on February 17, 2017, TSA sent Frontier TSA's final assessment and audit report regarding its Fee audit of the two and a half year period immediately preceding the Audit Period. Ex. 5; Abbey Decl. ¶ 14. During that audit, TSA reviewed tickets that presented the same exact scenarios as the supposed "errors" in this Audit, *i.e.*, cancelled tickets where Frontier collected a Fee from a customer, did not pay the amount of the Fee to TSA, included the Fee amount in credit to the customer, and then applied that credit either to the customer's cancellation fee or to both the customer's cancellation fee and a credit shell that later expired unused. *Id*. ¶ 14. TSA did not treat a single one of those tickets as errors, leading Frontier to believe there was nothing wrong with the way it handled those situations. *Id*. Further still, we understand that various other airlines have been handling these situations in the same way Frontier does and that for many years TSA took no action against them either.

Because TSA did not give Frontier fair notice of its interpretation that Fees on cancelled tickets must be refunded to the customer or paid to TSA or its interpretation of what qualifies as a "refund," TSA cannot hold Frontier liable in this matter, even if TSA is correct (which it is not) that Fees collected on cancelled tickets must be refunded to the customer (or paid to TSA) and that credit applied to pay cancellation fees or issued to credit shells that later expire do not qualify as refunds.

**C.    In the Alternative, If This Request for Review Is Denied, TSA Should Suspend Accrual of the Time to Delinquency While Frontier Obtains Judicial Review**

Department of Transportation regulations permit a party to request that TSA suspend the accrual of time to delinquency for any claim that is under review. 49 C.F.R. § 89.21(f)(1). TSA may also accept a written agreement to pay the claim proposed by the party disputing the debt. *Id.* § 89.21(g). Because Frontier intends to seek judicial review of any adverse administrative decision in this matter, it preemptively requests that, if TSA denies this request for review, TSA suspend the accrual of time to delinquency for the Claim until the judicial review process is complete.

Suspension of the accrual of time to delinquency is not only within TSA's authority, but it is also appropriate here because Frontier will be irreparably harmed if the alleged debt is

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 16

deemed delinquent before the judicial review process is complete.  The harm to Frontier if it is forced to pay the Claim prior to that time is not speculative:  Frontier would forever lose the interest on the amount it pays to TSA during the pendency of the judicial review proceedings because, as we understand it, TSA will not pay interest on the amount at issue if it is ultimately required to repay Frontier after success in the judicial review process.  TSA would not be similarly harmed if it agreed to suspend the accrual of time to delinquency, because Frontier will agree to pay TSA interest at the applicable federal rate from the time the alleged debt would have become delinquent after an adverse decision on this request for review and the time Frontier actually pays TSA any amount due after the judicial review process is complete.  Thus, the balance of the equities favors granting Frontier's request for a suspension of time to delinquency.

If TSA refuses to suspend the accrual of time to delinquency, Frontier will be harmed in a manner that will be irreparable.  Without an agreement from TSA allowing Frontier to pay the claim after the judicial review process, Frontier will be forced to pay the claim shortly after any adverse decision on this request for review.  *See* 49 C.F.R. § 89.21(f)(2) (if a claim is found valid, accrual of interest and time to delinquency shall commence 15 days after the agency mails the notification of decision).  Unless TSA agrees to pay interest on the claim during the period in which the case is in the judicial review process, Frontier will not receive any interest on the amount paid to satisfy the Claim.  *See United States v. N.Y. Rayon Importing Co*., 329 U.S. 654, 659 (1947) ("[I]nterest can be recovered against the United States only if express consent to such recovery has been given by Congress.  And Congress has indicated . . . that its consent can take only two forms: (1) a specific provision for the payment of interest in a statute; (2) an express stipulation for the payment of interest in a contract duly entered into by agents of the United States.").  Frontier will therefore never be made whole if it is forced to pay the Claim prior to completion of the judicial review process and it succeeds in that process.  That is, it will forever have lost the time value of the money paid to TSA beginning shortly after an adverse decision on this request for review until the time TSA returns that money after judicial review, if successful.

However, TSA will be no worse off if it agrees to suspend the accrual of time to delinquency until after the judicial review process because Frontier will agree to pay interest on the Claim from 15 days after TSA mails the notification of any adverse decision on this request for review until the time when the Claim is fully paid by Frontier following any adverse final ruling from the judicial review process.  This is consistent with how interest typically works in federal court:  Under Federal Rule of Appellate Procedure 37, if a money judgment in a civil case is affirmed, the applicable interest is payable from the date when the district court's judgment was entered.  *See* Fed. R. App. P. 37(a).

For these reasons, if TSA denies this request for review, we ask that TSA use its authority to suspend the accrual of time toward delinquency and agree that the Claim will not become delinquent until after a final judgment in the judicial review process.  Doing so would properly balance the equities so that either side would be fully compensated after that process is complete.

Pamela McMenamin, Compliance Manager
Transportation Security Administration
January 14, 2021
Page 17

## Conclusion

Because the Fee Statute allows TSA to obtain a Fee only when there is a passenger who engages in air transportation and, separately, because credit used to pay a cancellation fee or issued to a credit shell – whether eventually used or not – is a refund at the moment the cancellation fee is paid or the credit shell is issued, Frontier cannot be liable as TSA asserts in the Claim and the Audit Report. Frontier thus respectfully requests that TSA rescind the entire $5,377,584.15 purported liability associated with the PNR Sample. In the alternative, if this request for review is denied, TSA should suspend accrual of the time to delinquency for the Claim while Frontier pursues judicial review. If you have any questions or would like any additional information or supporting data, please let us know and we will provide it.

Sincerely,

Adam P. Feinberg
*Counsel for Allegiant Travel Company*

TSA Audit Notification Letter



U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598-6014

December 18, 2020

*Via Express Mail with Delivery Confirmation*

Nikki Dietz
Tax Director
Frontier Airlines
4545 Airport Way
Denver, CO 80239

Dear Ms. Dietz:

The U.S. Customs and Border Protection (CBP) Regulatory Audit Division completed a review of your company regarding compliance with the Passenger Civil Aviation Security Fee (September 11th Security Fee) Regulation. CBP conducted this review on behalf of the Transportation Security Administration (TSA) pursuant to an Interagency Agreement, as authorized under regulation (49 CFR Part 1510.19) which provides for authorized representatives to audit or review information necessary to verify that the security services fees have been properly collected and remitted with this part.

The TSA Office of Revenue has received a copy of the review findings and accepts it as evidence of a liability for September 11th Security Fees due to TSA for the audit period of July 1, 2016 through December 31, 2018. This review serves as the final September 11th Security Fee compliance examination of Frontier Airlines for this period. The total September 11th Security Fee liability determined during the review was $5,377,987.35. Please see the enclosed copy of the report for detailed explanations of this liability and findings.

Please be advised that if this debt is not paid in full within 30 days of the date of this letter, the debt will be considered delinquent. For delinquent debts, Federal law requires TSA to charge interest. The interest will be charged at the Treasury Current Value of Funds Rate, along with an administrative charge of $12.00 per month, representing the administrative costs of collection. Furthermore, if the amount assessed is not paid in full within 90 days of the date that the debt becomes delinquent, TSA is required to assess an additional collections-related penalty at an annual rate of 6%, accruing from the date of delinquency. In limited cases, TSA will consider written requests for the use of payment schedules, where justified by economic need and in the public interest. For your convenience, payment instructions are enclosed.

If TSA does not receive $5,377,987.35, the amount due and owing from the carrier, within 30 days of the date of this letter, TSA intends to enforce collection by taking one or more of the following actions:

(1) Administrative Offset -- Should the debt not be paid in full within 30 days, TSA will withhold any funds payable to your company to satisfy the debt.

(2) Treasury Department's Financial Management Service -- Debts that are delinquent for more than 60 days may be referred to the U.S. Department of Treasury for further collection action, including offset of Federal payments and tax refunds, or referral by the Department of Treasury to the U.S. Department of Justice for litigation. Debts that are delinquent for more than 120 days will be referred to the U.S. Department of Treasury for further collection action, including offset of Federal payments and tax refunds, or referral by the Department of Treasury to the U.S. Department of Justice for litigation.

(3) Private Collection Agency -- TSA may forward the debt to a private collection agency.

(4) Credit Bureau Reporting -- TSA may report the debt to commercial credit bureaus and consumer reporting agencies.

(5) Litigation -- TSA may refer the debt to the Department of Justice to initiate litigation to collect the debt.

(6) Federal loans or loan insurance or guaranties -- As required by 31 U.S.C. § 3720B and 31 C.F.R. § 901.6, the United States may decline to extend financial assistance in the form of a loan, loan guarantee, or loan insurance to any entity that is delinquent on a debt owed to a Federal agency. The United States will not extend credit until after the delinquency has been resolved.

(7) Suspension or revocation of eligibility for licenses, permits, or privileges -- TSA may suspend or revoke licenses, permits or any other privileges for any inexcusable or willful failure of a debtor to pay a debt.

Please also be advised that in addition to pursuing debt collection action, TSA is authorized by 49 U.S.C. § 46301 and 49 C.F.R. § 1503.401 to impose a civil penalty against an air carrier for each day that the air carrier failed to remit a security service fee in accordance with 49 C.F.R. part 1510 or 1511.  Pursuant to the Homeland Security Act of 2002, the maximum civil penalty is $34,174 per violation.  Each day that an air carrier fails to remit the required security service fee constitutes a separate violation.

Further, failure to remit the September 11th Security Fees may be considered an unfair and deceptive practice in violation of 49 U.S.C. § 41712, requiring referral to the U.S. Department of Transportation for enforcement action.  Finally, information concerning your company's failure to remit security service fees to TSA may be referred to the

Department of Transportation's Air Carrier Fitness Division for appropriate consideration with respect to your company's fitness to hold a certificate of public convenience and necessity under 49 U.S.C. § 41102.

You may make a written request for a review of TSA's determination of this compliance review. This includes any matter that may impact this debt determination, imposition, collection, remitting, and refunding of the fee during this audit period. The request must also state the basis for the dispute, including all factual information, documentation, citation to authority, argument, fees remitted in error or any other matters that may directly impact the findings, within 30 days of this notification. TSA will deny any requests raised after this timeframe as untimely. You may send your request to my office by email at tsa-fees@dhs.gov.

Additionally, you may address any correspondence to:

> Transportation Security Administration
> 6595 Springfield Center Drive
> Springfield, VA 20598-6014

The TSA compliance team greatly appreciates the cooperation and assistance your staff provided during this review.

Sincerely,

*Pamela McMenamin*

Pamela McMenamin
Compliance Manager


Enclosure
>       Copy of Compliance Review Report
>       Invoice
>       Remittance Instructions

Optional Form 1114 (2-79)
Title 7, GAO MANUAL

# BILL FOR COLLECTION

Department, establishment, bureau or office receiving funds:

Department of Homeland Security
Transportation Security Administration
c/o U.S. Coast Guard Finance Center (OG)
1430A Kristina Way, Chesapeake, VA 23326

| Customer Account Number | TSAAVD0094 |
|---|---|
| Invoice Number | PFDEC20D0094AU |
| Date of Invoice | 18-DEC-20 |
| Date Payment Due | 17-JAN-21 |

Bill to:

     Nikki Dietz
     Tax Director
     Frontier Airlines
     4545 Airport Way
     Denver, CO 80239

| Order No. | Article or Services | Amount |
|---|---|---|
| | | (Dollars and Cents) |
| 1 | Passenger Civil Aviation Security Fee (September 11th Security Fee) | $5,377,987.35 |
| | Audit Scope Period: July 1, 2016-December 31, 2018 | |
| | This invoice is pursuant to Federal Regulation 49 CFR Part 1510 | |
| | which provides for the compliance audit to verify that the security | |
| | fees have been properly collected and remitted. | |
| | Original Amount | $5,377,987.35 |
| | Amount Paid / Credited | $0.00 |
| | **Invoice Due Amount** | **$5,377,987.35** |

Agency Location Code:                    Project Number:

## Payment Instructions

1. For the September 11th Security Fee, see enclosed remittance instructions and Debt Collection Notice. For all other payment types, send check or money order to:

     U.S. DHS/ Transportation Security Administration
     P.O. Box 9279129
     St. Louis, MO 63197-9000

2. Make check or Money Order payable to: Transportation Security Administration.
3. Interest, administrative charges and penalties will be assessed on all payments not received by due date.
4. Write bill number on payment and provide a copy of your bill with your payment.
5. If you have questions regarding payment methods, please contact:

     TSA
     571-227-2323
     tsa-fees@dhs.gov

# Security Fees
# Payment Instructions

Tel: 571-227-2323  /  TSA-Fees@tsa.dhs.gov

Air carriers subject to the September 11 security fee will not receive an invoice and must initiate monthly payments to TSA according to regulation 49 C.F.R. 1510. Please follow any of the payment options below.

## Option A

Submit your payment securely online through Pay.Gov . Use direct withdrawl from a bank account (ACH debit in U.S. dollars). There is no fee for this transaction.

**Step 1**    Visit Pay.Gov to pay online.  Log in using your assigned username and password. *
**Step 2**    Select "My Forms, Private" select "continue" to access the form "September 11th Security Fee."
**Step 3**    Select payment method "ACH Direct Debit" and continue to the form. Ensure your banking institution authorizes direct debit.
**Step 4**    Enter  the carrier name, contact information, payment and select payment date.
                  Leave the reference number field blank, unless provided in written communication from TSA.   Select "Submit Data."
**Step 5**    Enter the account holder name, account type, routing number, account number.  Select "Submit Data."
**Step 6**    Check the box for the authorization and disclosure statement to finalize and submit your payment.

Be sure to print a copy for your records. If processing another payment, return to the available forms or log out to exit. You will receive an email notification from Pay.Gov once the payment is processed.

## Option B

Submit your payment through a domestic wire transfer. To initiate a wire transfer, you must provide the sending bank with the following (directions are provided in the order in which Federal wire transfer instructions request):

1.    **Receiver's ABA Number: 021030004.**  This is the routing symbol for the US Treasury at the Federal Reserve Bank in New York.
2.    Type Subtype: provided by the sending bank.
3.    Sending Bank's ARB Number: provided by the sending bank.
4.    Sending Bank's Reference Number: provided by the sending bank.
5.    **Amount:** Provide the dollar amount of the transfer. Ensure that the amount is punctuated with commas and a decimal point (example: $1,000,000.00). All banking fees are the responsibility of sender as stipulated in 49 C.F.R. 1510 and are not to be deducted from remittance to TSA.
6.    Sending Bank's Name: provided by the sending bank.
7.    **Receiver's Name: TREAS NYC -** Ensure that the sending bank enters this abbreviation. It must be used for all wire transfers to the Treasury Department.
8.    Product Code: normally CTR, or as provided by sending bank
9.    **Beneficial (BNF) Agency Location Code: 70110001 -** Ensure that the sending bank enters this eight-digit number as shown. This is the Agency Location Code for the Transportation Security Administration.
10.   **Reason for Payment: "September 11th Security Fee" "Month", "Year", "Amount" and "Carrier Name".** This information is required to ensure that your wire transfer is properly credited to your account.

## Option C

You may pay with a check drawn from a U.S. bank or money order for fees less than $1,000 only. Mail to:

Standard
**U.S.  Department of Homeland Security**
**Transportation Security Administration**
**P.O. Box 979129**
**St. Louis, MO 63197-9000**

Overnight
**U.S. Bank Government Lockbox**
**1005 Convention Plaza**
**Attn: Government Lockbox, SL-MOC2-GL/LBX #979129**
**St. Louis, MO 63101**

Please be sure to include the proper remittance advice including carrier name, fee month and year. Checks will be processed as an electronic funds transfer within 24 hours and will be shown in the account statement. TSA will keep a copy of the check and the original will be destroyed. TSA is authorized to process the copy in place of the orignal check if there are technical issues in processing. If the eletronic funds transfer cannot be completed due to insufficient funds, TSA may attempt the transfer up t times. All banking fees are the responsibility of the carrier.

* Email TSA-Fees@tsa.dhs.gov to obtain your login information. Provide your full name, contact information,
   air carrier name and mailing address.



Transportation
Security
Administration

# Security Fees
# Payment Instructions

Tel: 571-227-2323 / TSA-Fees@tsa.dhs.gov

**Option D**

Submit your payment through an international wire transfer. Funds must be remitted in U.S. dollar value. The air carrier is responsible for all banking fees and should not be deducted from the payment to TSA.  Please be sure to include the proper remittance advice including carrier name, fee month and year.

**Receiver**

**TREAS NYC**

**New York, NY US**

**Line 32A** Val Date/Currency/Interbank Settled Amount

Date: MM/DD/YYYY
Currency: U.S. dollar
Amount: **USD amount**

**Line 50k** Ordering customer name and address  country

Name
Address line 1
Address line 2
Customer Country

**Line 57D** **//FW021030004**

**TREAS NYC/FUNDS TRANSFER DIVISION**

**Line 59**   Enter the eight digit agency location code **ALC 70110001**

**Line 70**   **/RFB/** Add'l reference finformation (**TSA AY Fee for Month/Year**) and **ALC number 70110001**

**Line 71A** Details of charges  must be marked "**OUR**"



**Transportation
Security
Administration**



**DEPARTMENT OF HOMELAND SECURITY
U.S. CUSTOMS AND BORDER PROTECTION**

**AUDIT REPORT**

---

**FRONTIER AIRLINES
321-19-UF7-UF-27009
SEPTEMBER 3, 2020**

**OFFICE OF TRADE
REGULATORY AUDIT AND AGENCY ADVISORY SERVICES
CHICAGO FIELD OFFICE**

**WARNING**

This document is For Official Use Only (FOUO).  It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552).  It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with Department of Homeland Security (DHS) policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

**CRIMINAL PENALTIES**

This document contains trade secrets and commercial and financial information relating to the confidential business of private parties.  The Trade Secrets Act (18 U.S.C. 1905), provides penalties for disclosure of such information.  Federal employees who violate this act by making wrongful disclosures of confidential commercial information may be subject to a personal fine of not more than the greater of $100,000 or, if the person derives a financial gain from the offense, or the offense results in a financial loss to another person, a fine up to twice the gross gain or loss (18 U.S.C. 3571(b), (d)), imprisonment for not more than one year, or both; and shall be removed from employment.  Also, improper disclosure of certain information contained in this document may constitute a violation of the Privacy Act (5. U.S.C. 552a) and violators could be subject to a fine of not more than $5,000.

**FRONTIER AIRLINES**
**321-19-UF7-UF-27009**

**TABLE OF CONTENTS**

**SECTION**                                                                     **PAGE**

Introduction and Background ........................................................................................1

Objectives, Scope, and Methodology ..........................................................................1

Summary of Audit Results............................................................................................3

Comments of Responsible Officials ............................................................................4

Auditor's Rejoinder ......................................................................................................4

Schedule of Audit Results............................................................................................5

Findings

    Passenger Civil Aviation Security Service Fee ............................................. Finding Sheet
         Summary of Errors......................................................................... Attachment A
         Summary of Error Rate Liability ..................................................... Attachment B

Appendix

    TSA Letter Dated August 30, 2018 ...…………………………………….....Appendix I

    Company Comments…...................................................................................Appendix II

    Auditor's Rejoinder ………………………………………………………... Appendix III

**FOR OFFICIAL USE ONLY**

**FRONTIER AIRLINES**
**321-19-UF7-UF-27009**

## Introduction and Background

U.S. Customs and Border Protection (CBP) completed a Transportation Security Administration (TSA) Passenger Civil Aviation Security Service Fee (Security Fee) audit of Frontier Airlines. The audit fieldwork was performed at the company's offices located in Denver, Colorado from November 4, 2019 through November 7, 2019.

Frontier Airlines was founded in 1994 and is headquartered in Denver, Colorado. The airline operates flights currently serving more than 100 cities in the United States, Mexico, Canada, Jamaica, Puerto Rico, and the Dominican Republic.

During the audit scope period, July 1, 2016 through December 31, 2018, Frontier Airlines remitted $242,208,759.60 in TSA Security Fees to TSA.

CBP has not conducted a TSA Security Fee audit of Frontier Airlines since 2007. Frontier Airlines' recent TSA audit history includes TSA Security Fee audit report number 16-AID-0017, dated December 2016. The scope of the prior audit was January 1, 2014 through June 30, 2016.

## Objectives, Scope, and Methodology

The objectives of the audit were to determine if Frontier Airlines was compliant with Code of Federal Regulation (CFR) Title 49 Part 1510, "Imposition and Collection of Passenger Aviation Security Service Fees" and all associated amendments regarding the imposition, collection, recording, refunding, remitting, and reporting of the fee and quantify the monetary impact of any non-compliance.

The scope period of the TSA Security Fee audit of Frontier Airlines was July 1, 2016 through December 31, 2018.

To determine Frontier Airlines' compliance with regulations pertaining to the imposition, collection, recording, refunding, remitting, and reporting of the TSA Security Fee and to quantify the monetary impact of any noncompliance, we:

- reviewed TSA and Frontier Airlines remittance data, U.S. government and Frontier Airlines flight data, Frontier Airlines Navitaire[1] data, and general ledger data to establish preliminary audit concerns and assist in the design of tests;
- developed a sample universe of Passenger Name Record (PNR) using Frontier Airlines Navitaire data;

---

[1] Navitaire is a system utilized by Frontier Airlines that includes multiple components related to reservation and accounting, such as New Skies and Skyledger. New Skies is Frontier Airlines' reservation system that generates a Passenger Name Record to show information related to the passenger booking (passenger name, flight information, tax collected, etc.). The system does not create a ticket number because Frontier is a ticketless airline. Skyledger hosts Frontier Airlines' revenue accounting system, which is populated with data directly uploaded and generated from Frontier Airlines' reservation system.

**FOR OFFICIAL USE ONLY**

- validated the sample universe by tracing PNRs from 11 selected flight manifests to the universe of PNR data from Navitaire;
- statistically selected a sample of 500 PNRs, utilizing ACL software, to determine if Frontier Airlines imposed, collected, recorded, refunded, and remitted TSA Security Fees in accordance with TSA Regulations;
- discussed the sample selection of 500 PNRs and the extrapolation of errors over the scope period with the company and obtained its agreement with the sampling methodology;
- selected a non-statistical sample of six U.S. originating charter flights from the period of July 1, 2016 through December 30, 2016 (traditional charters with Apple), and eight U.S. originating charter flights from January 1, 2017 through December 31, 2018 (Apple purchases blocks of tickets) to determine whether Frontier Airlines imposed, collected, and remitted the TSA Security Fees in accordance with TSA regulations;
- selected a non-statistical sample of 16 general ledger transactions from Frontier Airlines TSA Security Fee general ledger account to determine whether the transactions were warranted and in accordance with TSA regulations;
- walked through Frontier Airlines' procedures for imposing, collecting, recording, reporting, refunding and remitting TSA Security Fees;
- reviewed  PNR sample documentation, including screen-prints and transaction detail reports from Frontier's Navitaire system, to determine if any under/over imposition, collection, recording, refunding, or remittance errors existed;
- traced the collection of TSA Security Fees for selected PNRs to verify the Security Fees were accurately recorded to Frontier's Transaction Detail Report extracted from Frontier's Navitaire System;
- reviewed charter flight sample documents, including charter agreements and addendums, purchase agreement, manifests, invoices and general ledger data, to determine if any imposition or collection errors existed;
- traced the collection of TSA Security Fees for each sample charter flight to verify the Security Fees were accurately recorded to the general ledger;
- reviewed 10 of the 16 sample general ledger transactions to verify the transactions were warranted and in accordance with TSA Security Fee regulations;
- reviewed the remittances made by Frontier Airlines to determine whether the remittances were submitted to TSA in accordance with regulations;
- reviewed the quarterly report information provided by Frontier Airlines to determine whether the reports were submitted to TSA in accordance with regulations; and
- quantified the monetary impact of any non-compliances.

We conducted this performance audit in accordance with generally accepted government auditing standards (GAGAS) except for the limitation noted below.  Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives.  We considered the limitations when developing our findings and conclusions.

<u>Scope Limitation</u>
For the general ledger review, we selected a total of 16 transactions to review Frontier's processes related to recording, reporting, refunding, and remitting the fees collected from passengers; however, we were unable to obtain sufficient, appropriate evidence in accordance

with GAGAS 8.90 for six of the general ledger transactions due to Frontier's 13-Month Record Retention Policy. Supporting data within Frontier's Navitaire Skyledger System (reservation and accounting system) is purged in 13 months; therefore, we were unable to review the details that support the general ledger transaction, or a list of all the associated PNRs with TSA Security Fee collections and refunds. This is a departure from GAGAS 8.90 because we were unable to review the selected general ledger transactions to determine whether Frontier correctly recorded, reported, refunded, and remitted the TSA Security Fees collected from passengers.

Since the transactions were systematic journal entries and Frontier maintained the same systems and processes for recording, reporting, refunding, and remitting the TSA Security Fee fees collected from passengers during the scope period, we concluded the results of our review of the remaining general ledger sample items (the manual or non-systematic journal entries), and the PNR samples and walkthrough transactions, would provide a reasonable basis for addressing the audit objectives and supporting our findings and conclusions.  Additionally, we reviewed Frontier's sales and refund population that provided us with insight into Frontier's general ledger activity related to TSA Security Fees. Despite the limitations, we determined that in total the evidence is sufficient to support the findings and conclusion.

## <u>Summary of Audit Results</u>

We determined Frontier Airlines was not compliant with TSA regulations pertaining to the imposition, collection, recording, refunding, remitting, and reporting of the TSA Security Fee. Frontier Airlines' noncompliance resulted in a liability of $5,377,987.35.  Our conclusions are summarized below:

- <u>PNR Sample</u>
  Our PNR sample review of 500 PNRs, consisting of 1,151 one-way trips, disclosed an error rate of 2.1720 percent along with an additional liability of $5,377,584.15 due to recording, refunding, and remittance errors. Our review did not identify any errors related to imposition and collection for the 500 PNR sample items.

- <u>Charter Flight Review</u>
  Our review of Frontier Airlines' charter flight activity disclosed five of six flights selected from July 1, 2016 through December 31, 2016 were actual charter flights; the sixth flight was a regular scheduled flight.  Our review did not identify any errors related to imposition, collection, and recording of the TSA Security Fee for the five charter flight sample items.  We also determined that the eight flights selected from January 1, 2017 through December 31, 2018 were not charter flights; therefore, we did not review these flights because the flights were covered by our review of the PNR and general ledger samples.

- <u>General Ledger Review</u>
  Our review of the general ledger disclosed Frontier did not properly record TSA Security Fees for three of the general ledger sample items, resulting in a net liability of $403.20. Our review also disclosed that Frontier did not properly impose and collect TSA Security Fees for four of the general ledger sample items, resulting in an over-imposition and

over-collection of $145.60.  We also found instances in the general ledger review where the postings were not made timely; therefore, we determined that Frontier did not record the imposed TSA Security Fees in a timely manner.

- Remittance to TSA
  Our review of Frontier Airlines' monthly remittances to TSA disclosed that Frontier Airlines was not remitting the accurate amount of collected fees to TSA. We identified errors in the recording and refunding of the fees, which resulted in the remittance of the fees being incorrect.  During our general ledger sample, we discovered that Frontier did not record or remit imposed TSA Security Fees in a timely manner.  Additionally, we determined Frontier Airlines did not submit one monthly remittance payment in a timely manner during our scope period.

- Quarterly Reports
  We identified errors in recording, refunding, and remitting of the fee, which Frontier Airlines included in its quarterly report data.  Therefore, we determined that Frontier Airlines was not compliant with TSA regulations regarding the reporting of the Security Fee.  Additionally, we determined Frontier Airlines did not submit quarterly reports in a timely manner for six of the ten quarters in the scope period.

## Comments of Responsible Officials

Frontier disagreed with the audit results related to PNR sample. Refer to Appendix II for the company's comments dated August 18, 2020.

## Auditor's Rejoinder

We do not agree with Frontier's comments regarding the PNR sample review; therefore, we made no changes to our audit findings. We completed an Auditor's Rejoinder in response to Frontier's comments to the findings. Refer to Appendix III for details.

The Schedule of Audit Results and Finding Sheet supporting our conclusions are attached.

Kevin Bridgford
Field Director
Office of Trade
Regulatory Audit and Agency Advisory Services
Chicago, Illinois

**FRONTIER AIRLINES**
**321-19-UF7-UF-27009**

**SCHEDULE OF AUDIT RESULTS**

| Finding Sheet | TSA Security Fee | Compliance with Security Fee Regulations | Liability* (Overpayment) |
|---|---|---|---|
| 1 | Passenger Name Record Review | Not Compliant | $5,377,584.15 |
| | General Ledger Review | Not Compliant | $403.20 |
| | Charter Flight Review | Compliant | - |
| | Remittance to TSA | Not Compliant | - |
| | Quarterly Reports | Not Compliant | **-** |
| | **Total Liability** | | **$5,377,987.35** |

*The TSA Office of Revenue will determine if interest and penalty amounts are due on the TSA Security Fee collected by the carrier but not remitted. Interest and penalties may be computed back to the period when the fees should have been remitted and the carrier will be invoiced for these amounts after the receipt of this final audit report. Audit liability amounts attributable to errors (such as those found by sampling during the audit process) may be subject to interest and penalty.

**FRONTIER AIRLINES**
**TRANSPORTATION SECURITY ADMINISTRATION**
**PASSENGER CIVIL AVIATION SECURITY SERVICE FEE**

<u>**Audit Area Objective**</u>

To determine if Frontier Airlines was compliant with Transportation Security Administration (TSA) Passenger Civil Aviation Security Service Fee (Security Fee) regulations pertaining to the imposition, collection, recording, refunding, remitting, and reporting of the fee as mandated by Title 49, Code of Federal Regulations (CFR), Part 1510, Passenger Civil Aviation Security Service Fees, and quantify the monetary impact of any noncompliance.

<u>**Conclusion**</u>

Frontier Airlines was not compliant with TSA regulations pertaining to the imposition, collection, recording, refunding, remitting, and reporting of the TSA Security Fee. Frontier Airlines' noncompliance resulted in a net liability of $5,377,987.35.

<u>**Criteria**</u>

49 CFR Part 1510 Imposition and Collection of Passenger Civil Aviation Security Service Fee: Interim Final Rule was amended on June 20, 2014, effective July 21, 2014, to restructure the Security Service Fee imposition from $2.50 per enplanement to $5.60 per one-way trip on qualifying air transportation sold. Effective December 19, 2014, the fee is capped at $11.20 per round trip.

49 CFR Section 1510.9(a) states that carriers must collect TSA Security Fees from passengers enplaning: 1) a scheduled passenger or public charter passenger operation with an aircraft having passenger seating configuration of more than 60 seats; and 2) a scheduled passenger or public charter passenger operation with an aircraft having a passenger seating configuration of less than 61 seats when passengers are enplaned from or deplaned into a sterile area.

49 CFR Section 1510.9(b) states that carriers must collect a TSA Security Fee from each passenger for air transportation sold on or after February 1, 2002. The TSA Security Service Fee must be based on the air travel itinerary at the time the air transportation is sold. Any changes by the passenger to the itinerary that alter the number of enplanements are subject to additional collection or refund of the TSA Security Service Fee by the carrier.

49 CFR Section 1510.13(a) states that each carrier must remit all TSA Security Fees imposed each calendar month to TSA by the last calendar day of the month following imposition.

49 CFR Section 1510.15(a) states that carriers must maintain an accounting system to properly record the service fees that are imposed, collected, refunded, and remitted. The accounting records must identify the airports at which the passengers were enplaned.

**FOR OFFICIAL USE ONLY**

49 CFR Section 1510.17 states that each carrier collecting TSA Security Fees must provide TSA with quarterly reports that provide an accounting of fees imposed, collected, refunded, and remitted by the last day of the calendar month following the quarter of the calendar year in which the fees were imposed.

49 CFR Section 1510.11(b) states that fees collected by a direct air carrier or foreign air carrier are held in trust by that direct carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940. The direct air carrier or foreign air carrier holds neither legal nor equitable interest in the security service fees except for the right to retain any accrued interest on the principal amounts collected pursuant to Section 1510.13(b).

TSA provided a letter, dated August 30, 2018, to Frontier regarding Frontier Airlines' Request for a refund of $1,224,067 for the periods of January 2014 through February 2015 (See Appendix).  The letter stated that Frontier's creation of a credit to the passenger that later expires is not a refund of the September 11th Security Fee to the passenger.

## Condition

### PNR Sample

We reviewed 500 PNRs, consisting of 1,151 qualifying one-way trips.  We identified errors on three PNRs, which resulted in three unremitted qualifying one-way trips, where Frontier imposed and collected the correct TSA Security Fees, but failed to remit the TSA Security Fees.  We also identified errors on nine PNRs, which resulted in 22 unremitted qualifying one-way trips, where Frontier imposed and collected the correct TSA Security Fee, but moved the fees into an account, which Frontier referred to as a 'credit shell,' that later expired.  Frontier recorded these fees as refunds, reducing its monthly remittance to TSA.  These errors resulted in an error rate of 2.1720 percent and an error rate liability of $5,377,584.15. (See Attachment A for details)

### General Ledger Review

We reviewed 10 of the 16 selected sample general ledger transactions. We identified recording errors on three of the sample items.  These errors resulted in a net understatement of the general ledger in the amount of $403.20.  We identified imposition and collection errors on four of the sample items; however, there was no monetary impact resulting from these errors.  We also found instances in the general ledger review where the postings were not made in the month of sale or refund, resulting in the fee not being remitted in the appropriate month.  Therefore, we determined that Frontier did not record and remit the imposed TSA Security Fees in a timely manner.

### Remittance to TSA

As stated above, we identified recording and refunding errors.  Frontier Airlines incorporated these errors in its remittances to TSA, which resulted in its remittances being incorrect.  During our general ledger sample, we discovered that Frontier did not remit imposed TSA Security Fees

in a timely manner.  Additionally, we determined Frontier Airlines did not submit one monthly remittance payment in a timely manner during our scope period.

Quarterly Reports
As stated above, we identified recording, refunding, and remittance errors.  Frontier Airlines incorporated these errors in its quarterly report data, which resulted in its quarterly report data being incorrect.  Additionally, we determined Frontier Airlines did not submit quarterly reports in a timely manner for six of the ten quarters in the scope period.

**Cause**

PNR Sample
The errors on three PNRs with three one-way trips that were not remitted occurred because Frontier recorded PNRs ABB72K, W6MTHP, and U95TPZ as refunds in their accounting system; however, the customers never received a refund for the TSA Security Fees. Therefore, the collected fees should have been remitted to TSA.

The errors on nine PNRs with 22 collected one-way trips that were not remitted related to expired credit shells.  PNRs issued by Frontier are generally non-refundable.  Passengers who wish to cancel their flights typically have three options regarding the non-refundable fare: (1) A credit shell is issued for the amount collected (fare plus taxes and fees) minus a $99 fee; (2) A credit shell is issued for the amount collected (fare plus taxes and fees) with a $99 fee paid by the passenger using a separate form of payment; or (3) No credit shell is issued and no refund is received.  When creating the credit shell, Frontier transfers the entire fare including all taxes and TSA Security fees minus the cancellation fee (if applicable) from the PNR to the credit shell account.  The credit shell can be used within 90 days to book future air transportation.  When the credit shell is created, the amount collected for the TSA Security Fee is removed from the general ledger account used to determine the remittance to TSA.  When the passenger uses the credit shell for a new booking, any applicable TSA Security Fees are posted to the general ledger account for the new itinerary. The errors we identified resulted from credit shells that expired without being used by the passenger.  When the credit shell expired, the entire credit shell amount was transferred to a revenue account, and the TSA Security Fees originally collected were not transferred to the TSA Security Fee general ledger account.  The customer never received a refund for the TSA Security Fees; therefore, the collected fees should have been remitted to TSA.  (See Attachment A for details)

General Ledger Review
The errors in the general ledger review occurred because of the following:

*Imposition and Collections Errors*

We identified imposition and collection errors in the debit posting of $100.80 in December 2017.  On PNR KYBI5A, Frontier imposed and collected three one-way trips in the amount of

$16.80, including a BCK[2] fee in the amount of $5.60, instead of two qualifying one-way trips based on the round trip itinerary for one passenger from Minneapolis (MSP) to Salt Lake City (SLC) to Denver (Denver) to MSP. Therefore, Frontier over-imposed and over-collected $5.60 in TSA Security Fees on PNR KYBI5A.

We also identified imposition and collection errors in the debit posting of $117.60 in March 2018. Frontier over-imposed and over-collected TSA Security Fees on PNRs QDYUPK, A5SC7M, R9JJHT, and ZBKR6N in the amount of $95.20.

- On PNR QDYUPK, Frontier imposed and collected eight one-way trips in the amount of $44.80, including a BCK fee of $22.40, instead of four qualifying one-way trips based on the round trip itinerary for two passengers from Charlotte (CLT) to DEN to Portland (PDX) to CLT. Therefore, Frontier over-imposed and over-collected $22.40 in TSA Security Fees on PNR QDYUPK.
- On PNR A5SC7M, Frontier imposed and collected eight one-way trips in the amount of $44.80, including a BCK fee of $22.40, instead of four qualifying one-way trips based on the round trip itinerary for two passengers from San Diego (SAN) to DEN to Warwick (PVD) to New York City (LGA) to DEN to SAN. Therefore, Frontier over-imposed and over-collected $22.40 in TSA Security Fees on PNR A5SC7M.
- On PNR R9JJHT, Frontier imposed and collected nine one-way trips in the amount of $50.40, including a BCK fee of $33.60, instead of six qualifying one-way trips based on the round trip itinerary for three passengers from Missoula (MSO) to DEN to Chicago (ORD) to MSO. Therefore, Frontier over-imposed and over-collected $16.80 in TSA Security Fees on PNR R9JJHT.
- On PNR ZBKR6N, Frontier imposed and collected 12 one-way trips in the amount of $67.20, including a BCK fee for $33.60, instead of six qualifying one-way trips based on the round trip itinerary for three passengers from PDX to DEN to Dallas (DFW) to DEN to PDX. Therefore, Frontier over-imposed and over-collected $33.60 in TSA Security Fees on PNR ZBKR6N.

We also identified imposition and collection errors in the credit posting of $44.80 in November 2017. On PNR Y82WWM[3], Frontier imposed and collected six one-way trips for $33.60, including a BCK fee for $22.40, instead of four qualifying one-way trips based on the round trip itinerary for two passengers from SLC to DEN to Houston (IAH) to DEN to SLC. Therefore, Frontier over-imposed and over-collected $11.20 in TSA Security Fees on PNR Y82WWM

---

[2] BCK was the code used for manually working married fares, which is an itinerary that includes a stopover. Passengers and flights associated with a PNR with a stopover are permanently married and cannot be broken apart. If one of the passengers cancels or modifies one segment of the total trip, any refund or additional collection has to be manually adjusted between the various segments within the PNR otherwise the PNR is out of balance and Frontier cannot close out their general ledger.

[3] PNR Y82WWM was identified in both the credit posting of $44.80 in November 2016 and the debit posting of $100.80 in December 2017. We took both postings into consideration when determining the existence of errors.

**FOR OFFICIAL USE ONLY**

We also identified imposition and collection errors in the credit posting of $308.00 in April 2018. Frontier over-imposed and over-collected TSA Security Fees on PNRs DCJEMX and O8U25G in the amount of $33.60.

- On PNR DCJEMX, Frontier imposed and collected six one-way trips for $33.60, including a BCK fee for $11.20, instead of four qualifying one-way trips based on the round trip itinerary for two passengers from SLC to DEN to Orlando (MCO) to DEN to SLC. Therefore, Frontier over-imposed and over-collected $11.20 in TSA Security Fees on PNR DCJEMX.
- On PNR O8U25G, Frontier imposed and collected eight one-way trips for $44.80, including a BCK fee for $22.40, instead of four qualifying one-way trips based on the round trip itinerary for two passengers from San Francisco (SFO) to DEN to Saint Louis (STL) to DEN to SFO. Therefore, Frontier over-imposed and over-collected $22.40 in TSA Security Fees on PNR O8U25G.

*Recording Errors*

We identified recording errors in the debit posting of $100.80 in December 2017. Frontier incorrectly debited the TSA Security Fee general ledger for PNRs R8HV8G, D2HF7V, W7HINM, Z3F9UL, Y82WWM[2], and KYBI5A for a total of $100.80. These errors occurred because Frontier reversed the signs and debited the entry when it should have credited the entry.

We identified recording errors in the debit posting of $117.60 in March 2018. Frontier incorrectly debited the TSA Security Fee general ledger for PNRs PY1ZMD, KCYVPK, G9PJXD, P4D77S, QDYUPK, A5SC7M, R9JJHT, and ZBKR6N for a total of $235.20. These errors occurred because Frontier reversed the signs and debited the entry when it should have credited the entry.

We also identified recording errors in the credit posting of $308.00 in April 2018. Frontier incorrectly credited the TSA Security Fee general ledger for PNRs DCJEMX and O8U25G for a total of $67.20. These errors occurred because Frontier incorrectly offset the sampled credit with the TSA Security fees coded to the BCK.

*Timing Errors*

Frontier did not record the TSA Security Fee collections to the general ledger in a timely manner. These errors occurred because Frontier did not record the fees in the general ledger in the month of the sale, which also affected the timeliness of Frontier's TSA Security Fee remittances.

We identified timing errors in the debit posting of $100.80 in December 2017. These errors occurred because the flights related to several PNRs (R8HV8G, D2HF7V, W7HINM, Z3F9UL, Y82WWM, KYBI5A, and OEQRHR) were flown prior to December 2017; however, Frontier did not record those PNRs until December 2017.

We also identified timing errors in the debit posting of $117.60 in March 2018. These errors occurred because the flights related to several PNRs (PY1ZMD, KCYVPK, G9PJXD, P4D77S, QDYUPK, A5SC7M, R9JJHT, and ZBKR6N) were flown prior to March 2018; however, Frontier did not record those PNRs until March 2018.

We also identified timing errors in the debit posting of $945.20 in June 2018.  These errors occurred because flights related to several PNRs (V38BFL, C4G5GS, E6HI2Z, L86VFJ, UYR22Q, T5NR3C, X3KN5Y, T52Z9F, J2MBRY, and AYDTMQ) were flown prior to June 2018; however Frontier did not record those PNRs until June 2018.

We also identified timing errors for all the PNRs in the credit posting of $2,260.40 in May 2017. These errors occurred because Frontier recorded TSA Security Fees collected in 2014, which is prior to the scope period, to the TSA Security Fee general ledger in May 2017.  Frontier indicated the posting was a true up resulting from its switch of revenue accounting systems in 2015. Note: We did not review the PNRs since they were issued outside of the scope period.

We also identified timing errors for all the PNRs in credit posting of $44.80 in November 2017. These errors occurred because flights for all the PNRs (R8HV8G, D2HF7V, W7HINM, Z3F9UL, and Y82WWM) associated with these credit posting were flown prior to November 2017; however, Frontier did not record those PNRs until November 2017.

Remittance to TSA

As stated above, we identified errors in the PNR and general ledger reviews.  These errors were included in Frontier Airlines' recording and remittance data, causing its recording and remittances to be incorrect.  Additionally, we identified one remittance payment that was not remitted in a timely manner.  The payment for July 2017 was due on August 31, 2017, but Frontier did not submit the payment until September 5, 2017.

Quarterly Reports

As stated above, we identified errors in the PNR Sample and general ledger reviews.  Frontier Airlines included these errors in its quarterly report data, causing its quarterly report data to be incorrect.  Additionally, we identified several quarterly reports that were not submitted timely. Frontier did not submit the quarterly reports for 3rd Quarter 2017, 4th Quarter 2017, 1st Quarter 2018, 2nd Quarter 2018, 3rd Quarter 2018, and 4th Quarter 2018 until February 19, 2019, which was after the audit was announced.

**Effect**

We identified a net TSA Security Fee liability of $5,377,987.35 for the errors identified during the period of July 1, 2016 through December 31, 2018.  See Attachment B for details.

**Recommendations to TSA**

We recommend that TSA properly address the liability of $5,377,987.35.

**FOR OFFICIAL USE ONLY**

## Comments of Responsible Officials

Frontier disagreed with the audit results related to the PNR sample. Refer to Appendix II for the company's comments dated August 18, 2020.

## Auditor's Rejoinder

We do not agree with Frontier's comments regarding the PNR sample review; therefore, we made no changes to our audit findings. We completed an Auditor's Rejoinder in response to Frontier's comments to the findings. Refer to Appendix III for details.

Finding Sheet
321-19-UF7-UF-27009
Attachment A
Page 1 of 1

**FRONTIER AIRLINES**
**SUMMARY OF ERRORS**

| PNR Number* | Booking Date | Itinerary | Number of Passengers | Number of Qualifying One-Ways | Number of Collected One-Ways | Number of Collected One-ways Not Remitted | Number of Errors |
|---|---|---|---|---|---|---|---|
| ABB72K | 10/10/2017 | AUS-ONT | 1 | 1 | 1 | 1 | 1 |
| **U5EMHF** | 11/29/2017 | MKE-LAS-MKE | 2 | 4 | 4 | 4 | 4 |
| **O4J4WV** | 04/04/2017 | DEN-CVG-DEN | 1 | 2 | 2 | 2 | 2 |
| **O7ZK2Z** | 03/09/2017 | PDX-DEN-PDX | 1 | 2 | 2 | 2 | 2 |
| **R4U1MF** | 03/19/2017 | ORD-DEN-ORD | 1 | 2 | 2 | 2 | 2 |
| **FDB1KX** | 04/25/2018 | DEN-PDX | 1 | 1 | 1 | 1 | 1 |
| **S3J34Y** | 07/31/2018 | RDU-TTN-RDU | 1 | 2 | 2 | 2 | 2 |
| **JYFP5N** | 09/23/2016 | LAX-DEN-TPA | 1 | 2 | 2 | 2 | 2 |
| W6MTHP | 05/31/2017 | CLE-LAX | 1 | 1 | 1 | 1 | 1 |
| **GY4G6Q** | 02/18/2018 | MCO-COS-MCO | 3 | 6 | 6 | 6 | 6 |
| **M9DNKG** | 11/4/2017 | DEN-DCA | 1 | 1 | 1 | 1 | 1 |
| U95TPZ | 9/23/2018 | AUS-SLC | 1 | 1 | 1 | 1 | 1 |

*Bolded PNRs represent errors related to expired credit shells.

**FOR OFFICIAL USE ONLY**

**FRONTIER AIRLINES**
**SUMMARY OF ERROR RATE LIABILITY**

| | |
|---|---|
| **Sampled Qualifying One-ways (a)** | 1,151 |
| **Collected One-Ways not Remitted (b)** | 25 |
| **Remittance Error Rate (c)=(b)/(a)** | 2.1720% |

| Year | Periods | Net Collections Remitted by Frontier (d) | Additional Collections Based on General Ledger Review (e) | Net Collection Plus G/L Findings (f)=(d)+(e) | Error Rate Liability resulting from Remittance Errors (g) = (f) / [1 - (c)] - (f) | Total Security Fees Due (h)=(f)+(g) | Security Fees Outstanding (i) = (h) - (d) |
|---|---|---|---|---|---|---|---|
| 2016 | July | $7,406,207.20 | $0.00 | $7,406,207.20 | $164,434.33 | $7,570,641.53 | $164,434.33 |
| | August | $7,123,032.00 | $0.00 | $7,123,032.00 | $158,147.21 | $7,281,179.21 | $158,147.21 |
| | September | $6,696,552.80 | $0.00 | $6,696,552.80 | $148,678.42 | $6,845,231.22 | $148,678.42 |
| | October | $7,248,001.60 | $0.00 | $7,248,001.60 | $160,921.82 | $7,408,923.42 | $160,921.82 |
| | November | $8,014,025.60 | $0.00 | $8,014,025.60 | $177,929.26 | $8,191,954.86 | $177,929.26 |
| | December | $5,259,564.80 | $0.00 | $5,259,564.80 | $116,774.08 | $5,376,338.88 | $116,774.08 |
| 2017 | January | $7,458,869.60 | $0.00 | $7,458,869.60 | $165,603.56 | $7,624,473.16 | $165,603.56 |
| | February | $6,759,155.20 | $0.00 | $6,759,155.20 | $150,068.34 | $6,909,223.54 | $150,068.34 |
| | March | $7,619,438.40 | $0.00 | $7,619,438.40 | $169,168.54 | $7,788,606.94 | $169,168.54 |
| | April | $7,381,903.20 | $0.00 | $7,381,903.20 | $163,894.73 | $7,545,797.93 | $163,894.73 |
| | May | $7,077,912.80 | $0.00 | $7,077,912.80 | $157,145.47 | $7,235,058.27 | $157,145.47 |
| | June | $8,651,837.60 | $0.00 | $8,651,837.60 | $192,090.11 | $8,843,927.71 | $192,090.11 |
| | July | $7,938,319.20 | $0.00 | $7,938,319.20 | $176,248.41 | $8,114,567.61 | $176,248.41 |
| | August | $8,294,557.60 | $0.00 | $8,294,557.60 | $184,157.70 | $8,478,715.30 | $184,157.70 |
| | September | $7,040,196.80 | $0.00 | $7,040,196.80 | $156,308.09 | $7,196,504.89 | $156,308.09 |
| | October | $8,815,760.80 | $0.00 | $8,815,760.80 | $195,729.57 | $9,011,490.37 | $195,729.57 |

**FOR OFFICIAL USE ONLY**

| Year | Periods | Net Collections Remitted by Frontier (d) | Additional Collections Based on General Ledger Review (e) | Net Collection Plus G/L Findings (f)=(d)+(e) | Error Rate Liability resulting from Remittance Errors (g) = (f) / [1 - (c)] - (f) | Total Security Fees Due (h)=(f)+(g) | Security Fees Outstanding (i) = (h) - (d) |
|---|---|---|---|---|---|---|---|
| | November | $10,068,592.80 | $0.00 | $10,068,592.80 | $223,545.24 | $10,292,138.04 | $223,545.24 |
| | December | $6,499,931.20 | $100.80 | $6,500,032.00 | $144,315.22 | $6,644,347.22 | $144,416.02 |
| 2018 | January | $8,401,747.20 | $0.00 | $8,401,747.20 | $186,537.54 | $8,588,284.74 | $186,537.54 |
| | February | $8,211,733.60 | $0.00 | $8,211,733.60 | $182,318.82 | $8,394,052.42 | $182,318.82 |
| | March | $7,998,452.00 | $235.20 | $7,998,687.20 | $177,588.71 | $8,176,275.91 | $177,823.91 |
| | April | $8,548,573.60 | $67.20 | $8,548,640.80 | $189,798.91 | $8,738,439.71 | $189,866.11 |
| | May | $8,777,568.80 | $0.00 | $8,777,568.80 | $194,881.62 | $8,972,450.42 | $194,881.62 |
| | June | $9,211,575.60 | $0.00 | $9,211,575.60 | $204,517.54 | $9,416,093.14 | $204,517.54 |
| | July | $9,519,148.80 | $0.00 | $9,519,148.80 | $211,346.35 | $9,730,495.15 | $211,346.35 |
| | August | $9,738,019.20 | $0.00 | $9,738,019.20 | $216,205.77 | $9,954,224.97 | $216,205.77 |
| | September | $9,277,212.00 | $0.00 | $9,277,212.00 | $205,974.82 | $9,483,186.82 | $205,974.82 |
| | October | $9,042,852.00 | $0.00 | $9,042,852.00 | $200,771.50 | $9,243,623.50 | $200,771.50 |
| | November | $10,039,170.40 | $0.00 | $10,039,170.40 | $222,892.00 | $10,262,062.40 | $222,892.00 |
| | December | $8,088,847.20 | $0.00 | $8,088,847.20 | $179,590.47 | $8,268,437.67 | $179,590.47 |
| Total | | $242,208,759.60 | $403.20 | $242,209,162.80 | $5,377,584.15 | $247,586,746.95 | $5,377,987.35 |

**FOR OFFICIAL USE ONLY**

**FRONTIER AIRLINES**
**TSA LETTER DATED AUGUST 30, 2018**



U.S. Department of Homeland Security
Arlington, VA 20598-6014

**Transportation**
**Security**
**Administration**

August 30, 2018

***Via Express Delivery with Confirmation***

Nikki Dietz
Tax Director
Frontier Airlines, Inc.
4545 Airport Way
Denver CO 80239

*Re: Frontier Airlines' Request for a refund of $1,224,067 for the periods of January 2014
through February 2015*

Dear Ms. Dietz:

On March 17, 2017, Frontier Airlines, Inc. (Frontier) requested a refund of $1,224,067
from the U.S. Transportation Security Administration (TSA) for the periods of January
2014 through February 2015 "relating to TSA [fees] refunds that were issued to
customers due to itinerary changes" (or canceled tickets) in the form of a credit rather
than a refund in the original form of payment to the passenger.

Frontier states *"refunds were issued to customers due to itinerary changes but for which
Frontier inadvertently did not claim a corresponding September 11th Security Fee refund
on their applicable TSA returns. The refunds that were issued to customers were for
flights that never lifted for them due to an itinerary change and for which the customer
had requested and received a refund in the form of a credit to the customer's account and
for which supporting documentation was maintained."*

Frontier further clarified on November 30, 2017 (attached in full) that for the transactions
in this matter, a credit to the ticket purchaser is available for use for up to one year from
the date of issuance. If the credit is used, taxes and fees are calculated and remitted on the
new fare. If the credit remains unused within one year, the credit expires and Frontier
retains the TSA fee collected from the passenger. Frontier states that from January 2014
through February 2015, Frontier failed to claim (against current TSA liabilities) an offset
for the expired credit fee amounts in this matter.

On November 21, 2002 (TSA-02-11120-59), TSA provided guidance on refunds in
response to an inquiry from the industry (attached in full):

> *Under 49 CFR Part 1510, air carriers and foreign air carriers are required to
> collect September 11'h Security Fees, hold them in trust for TSA, and remit them to TSA*

**FOR OFFICIAL USE ONLY**

*by the end of the month following the calendar month in which the transportation was sold. These carriers are responsible for the safekeeping and accounting of these fees. While Part 1510 does not address in detail how refunds are to be handled, it clearly indicates that air carriers and foreign air carriers are responsible for refunding September 11th Security Fees to ticket purchasers. Specifically, it provides that "[a]ny changes by the passenger to the itinerary that alter the number of enplanements are subject to additional collection or refund of the security service fee by the direct air carrier or foreign air carrier as appropriate." 49 CFR § 1510.9(b) (emphasis added). When a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value, the September 11th Security Fee involved is subject to a refund by the collecting carrier to the ticket purchaser. If such a ticket purchaser requests a refund of the September 11th Security Fee collected, the carrier must provide the requester with a full refund of the fee…in any case where air carrier does not refund September 11th Security Fees to the ticket purchaser, the fees must be remitted or remain with TSA…"*

Further, Section 1510.11 (b) HANDLING OF SECURITY SERVICE FEES states… *"Security services fees collected by a direct air carrier or foreign air carrier are held in trust by that direct carrier for the beneficial interest of the United States in paying for the costs of providing civil aviation security services described in 49 U.S.C. 44940. The direct air carrier or foreign air carrier holds neither legal nor equitable interest on the security services fees except for the right to retain any accrued interest on the principal amounts collected pursuant to 1510.13 (b)."*

Frontier's creation of a credit to the passenger that later expires is not a refund of the September 11th Security Fee to the passenger. In this matter Frontier has not provided any of the passengers with a "…full refund of the fee (TSA-02-11120-59)". Therefore, TSA denies Frontier's request of March 17, 2017 for refund of the September 11th Security Fees already remitted to TSA.

Sincerely,

*Pamela McMenamin*

Pamela McMenamin
Revenue Compliance Manager

Enclosed:
      Frontier Refund Request dated March 17, 2017
      Frontier TSA Refund Memorandum dated March 17, 2017
      Email correspondence dated November 30, 2017
      TSA Refund Guidance dated November 21, 2002 (TSA-02-11120-59)

**FOR OFFICIAL USE ONLY**

## FRONTIER AIRLINES
## COMPANY COMMENTS

**From:** Dietz, Nikki <Nikki.Dietz@flyfrontier.com>

**Sent:** Tuesday, August 18, 2020 9:28 AM

**To:** KING, TESHA L <tesha.l.king@cbp.dhs.gov>

**Cc:** BINGHAM, KENNETH J <KENNETH.J.BINGHAM@CBP.DHS.GOV>

**Subject:** RE: Frontier TSA Audit: Tentative Audit Findings

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact the CBP Security Operations Center with questions or concerns.

Hi Tesha – Below are comments we would like to include within the audit report.  No exit interview is necessary.

We disagree with the preliminary findings from the TSA audit for reasons including, but not limited to: (i) a full refund was made to each customer at his/her request, including fare, fees, and taxes, (ii) each customer used the refund, in part, to pay for the administrative fees associated with the change in itinerary, (iii) guidance issued by the TSA highlights that a change in itinerary by a passenger is "... subject to additional collection or refund of the security service fee by the direct air carrier ..." but is silent as to how this transaction should be accomplished, (iv) although TSA is not governed by the IRS, IRS guidance supports the validity of a credit shell as a refund, and (v) the individual requesting the refund of the otherwise non-refundable ticket is not "a passenger" as defined in the TSA guidance and therefore not subject to the TSA security fee.  In addition to our disagreement with the basis of the preliminary findings identified in the audit, we also disagree with how the findings were extrapolated.

Thanks,

**Nikki Dietz**

Tax Director

P: 720.374.4622

C: 904.383.0825

E: nikki.dietz@flyfrontier.com

FlyFrontier.com



**FOR OFFICIAL USE ONLY**

# FRONTIER AIRLINES
## AUDITOR'S REJOINDER

**Company Comments:** *We disagree with the preliminary findings from the TSA audit for reasons including, but not limited to: (i) a full refund was made to each customer at his/her request, including fare, fees, and taxes, (ii) each customer used the refund, in part, to pay for the administrative fees associated with the change in itinerary, (iii) guidance issued by the TSA highlights that a change in itinerary by a passenger is "… subject to additional collection or refund of the security service fee by the direct air carrier …" but is silent as to how this transaction should be accomplished, (iv) although TSA is not governed by the IRS, IRS guidance supports the validity of a credit shell as a refund, and (v) the individual requesting the refund of the otherwise non-refundable ticket is not "a passenger" as defined in the TSA guidance and therefore not subject to the TSA security fee.*

**Auditor's Rejoinder:** TSA Security Fees are to be collected by the air carrier when a ticket for future air transportation is sold.

For each identified error, Frontier collected fees from the passenger on behalf of TSA for the security service fees associated with the purchased air transportation. For 22 of the errors identified, the passengers did not use the purchased ticket and were issued a credit shell by Frontier that went unused and eventually expired.  Upon expiration of the credit shell, Frontier gained an equitable interest in the collected fees by recognizing the amounts as revenue and neither refunding the fees to the purchaser nor remitting the fees to TSA. For three of the errors identified, the passengers did not use the purchased ticket and were not issued a credit shell by Frontier. Upon cancellation of the purchased ticket, Frontier gained an equitable interest in the collected fees by recognizing the amounts as revenue and neither refunding the fees to the purchaser nor remitting the fees to TSA.

TSA issued guidance to air carriers for instances when the customer does not use a ticket that had been purchased for air transportation that states "when a ticket purchaser does not use a ticket for air transportation and the ticket then expires or loses its value, the September 11th Security Fee involved is subject to a refund by the collecting carrier to the ticket purchaser.  If such a ticket purchaser requests a refund of the September 11th Security Fee collected, the carrier must provide the requester with a full refund of the fee…in any case where air carrier does not refund September 11th Security Fees to the ticket purchaser, the fees must be remitted or remain with TSA." Frontier argues that a full refund was made to each customer at his/her request, including fare, fees, and taxes, and the customer used the fees to pay for administrative fees.  Frontier indicated during fieldwork that in order for a customer to receive a credit shell, they must pay a $99 cancellation fee; Frontier claimed that the full amount was refunded to the customer, and the customer used the refund to pay the cancellation fee and the remainder of the refund went to the credit shell.  This was not a refund that the passenger then used to pay an administrative fee; rather, it was a portion of the amount paid that was retained by Frontier.  A passenger was not able to obtain a credit shell without the cancellation fee being deducted or paid via another form of payment.

**FOR OFFICIAL USE ONLY**

Title 49 CFR 1510.11 (b) states that "the direct air carrier or foreign air carrier holds neither legal nor equitable interest on the security service fees except for the right to retain any accrued interest on the principal amounts collected pursuant to 1510.13 (b)." By retaining the fees collected on behalf of TSA and recognizing those fees as revenue, Frontier has created an equitable interest in the principal amounts. The determination as to whether a credit shell constitutes a refund of any collected TSA Security Fees cannot be made until the credit shell either expires unused or is used to purchase new transportation as the use or expiration of the credit shell is what creates an equitable interest in the fees.

Lastly, Frontier's citations of Internal Revenue Service language are not applicable to the TSA Security Fee.

**Company's Comments:** *In addition to our disagreement with the basis of the preliminary findings identified in the audit, we also disagree with how the findings were extrapolated.*

**Auditor's Rejoinder:** Frontier did not state any disagreement with the sampling methodology throughout the audit.

On February 13, 2019, Frontier was provided an Engagement Letter that stated, "As agreed upon, if a valid universe of ticket-level data is available to the audit team, we will be using that data to statistically select a sample of tickets. If it is not available, the audit team will non-statistically select flights to sample tickets. Regardless of the selection method, we will review the complete flight itinerary for each ticket sampled to determine if there are any discrepancies. If discrepancies are found, we will calculate the error rate within the reviewed sample and apply these error rates to the net TSA Security Fee collections for the sample frame." At this time, Frontier did not disagree with our methodology. In an email on August 21, 2019 and in the Notification Letter provided on October 22, 2019, we again reiterated the sampling methodology and noted that any errors would be extrapolated. At this time, Frontier did not disagree with our methodology. We provided Frontier with a summary of the audit findings and calculations of liabilities owed to TSA on May 19, 2020, which showed how the errors were extrapolated over the collections made during the scope period. At this time, Frontier did not disagree with our methodology. Frontier was informed throughout the audit that any findings would be used to calculate the error rate and extrapolated against TSA Security Fees collected during the scope period. Frontier did not provide any detail regarding its disagreement with how the findings were extrapolated.

**FOR OFFICIAL USE ONLY**

# TSA 2002 Guidance Letter
# TSA-2001-11120-0059



*United States Department of Transportation*
**TRANSPORTATION SECURITY ADMINISTRATION**

400 Seventh Street, S.W.
Washington D.C. 20590

NOV 2 1 2002

Mr. James A Hultquist
Managing Director, Taxes
Air Transport Association
1301 Pennsylvania Ave., N.W., Suite 1100
Washington, DC 20004-1707

Docket No. 11120

$TSA \cdot 02 \cdot /1120 - 59$

Dear **Mr.** Hultquist:

Thank you for your letter of October 9, 2002, on behalf of the members of the Air
Transport Association (ATA) requesting guidance on the refundability of the
Transportation Security Administration's (TSA) September 11th Security Fee to ticket
purchasers who do not travel on their scheduled flights, particularly where the tickets are
nonrefundable and have no value toward future travel. In addition, you inquire as to
whether carriers or TSA should provide refunds of September 11th Security Fees to ticket
purchasers, as it is common for carriers to have already remitted to TSA the actual fees
collected from ticket purchasers. You note that ATA is also seeking guidance from the
U.S. Department of Agriculture, the Immigration and Naturalization Service, and the
Customs Service on their passenger fee refund requirements. Finally, you refer to
Revenue Ruling 89-109, in which the Internal Revenue Service held that, to the extent
that airlines do not refund the cost of airline tickets to passengers, the attributable taxes
are due to be remitted to the Government.

On October 10, TSA placed a copy of your letter in the Department of Transportation's
Docket Management System (DMS) for public review. The DMS is accessible online at
http://dms.dot.gov and your letter is identified as item 57 in Docket No. TSA-2001-
11120. TSA also placed a copy of this response in that docket.

Under 49 CFR Part 1510, air carriers and foreign air carriers are required to collect
September 11th Security Fees, hold them in trust for TSA, and remit them to TSA by the
end of the month following the calendar month in which the transportation was sold.
These carriers are responsible for the safekeeping and accounting of these fees. While
Part 1510 does not address in detail how refunds are to be handled, it clearly indicates
that air carriers and foreign air carriers are responsible for refunding September 11th
Security Fees to ticket purchasers. Specifically, it provides that "[a]ny changes by the
passenger to the itinerary that alter the number of enplanements are subject to additional
collection or refund of the security service fee by the direct air carrier or foreign air
carrier as appropriate." 49 CFR § 1510.9(b) (emphasis added). When a ticket purchaser
does not use a ticket for air transportation and the ticket then expires or loses its value,
the September 11th Security Fee involved is subject to a refund by the collecting carrier to
the ticket purchaser. If such a ticket purchaser requests a refund of the September 11th
Security Fee collected, the carrier must provide the requester with a full refund of the fee.

TSA is considering promulgating further details concerning refunding September 11th Security Fees, as will be reflected in the Final Rule for 49 CFR Part 1510. In any case where an air carrier does not refund September 11th Security Fees to the ticket purchaser, the fees must be remitted to or remain with TSA.

Where a carrier remits a September 11th Security Fee to **TSA** and then refunds the fee to a ticket purchaser, the carrier may offset the refund by deducting it from the September 11th Security Fees remitted to TSA for the month in which the refund is provided. In such circumstances, the carrier must keep auditable records of the refund, as required by 49 CFR 1510.15. The carrier must also accurately denote the refund in its quarterly report of September 11" Security Fees imposed, collected, refunded and remitted, as required by 49 CFR 1510.17, as amended.

If you need further assistance, please contact me at (202) 385-1209. You may also contact Steven Cohen in the Office of the Chief Counsel at (202) 493-1216.

Sincerely,

*Rudall S. Fist*

Randall Fiertz
Acting Director of Revenue

2

ATA  Inquiry Letter
TSA-2001-11120-0057

*196465*



DEPT. OF TRANSPORTATION
DOCKETS

02 OCT 10 PM 3: 2..

## AIR TRANSPORT ASSOCIATION

**JAMES A. HULTQUIST**
*Managing Director, Taxes*

October 9, 2002

Randall Fiertz
Acting Director of Revenue
Transportation Security Administration
Department of Transportation
400 Seventh St. SW.
Washington, DC 20590      $TSA - 2001 - 11120 - 57$

Re: Application of Passenger Civil Aviation Security Service Fees

Dear Mr. Fiertz:

This letter is on behalf of the member airlines of the Air Transport Association of America
(ATA). The ATA is the United States' oldest and largest airline trade association. Our members
include 22 U.S. and five associate (non-U.S.) airlines.[1] U.S members account for more than 95
percent of the passenger and cargo traffic carried by scheduled U.S. airlines.

Recently, several ATA members received inquiries regarding the refundability of various
governmentally imposed fees paid by passengers who do not travel on their scheduled flights (not
including changes due to weather, mechanical problems, etc.). Under the rules applicable to
certain tickets, if a passenger does not travel as scheduled, the tickets for the unused travel will
expire and the amount paid for the unused travel will not be refunded and will have no value
toward future travel. Depending upon the ticket, the timing of this expiration may be as early as
the originally scheduled date of transportation or as much as 12 months after that date.

The airlines are seeking guidance as to the proper treatment of the Passenger Security Service
Fee administered by the TSA when tickets expire.[2] Airlines are required to collect this fee from

---

[1] The members are Airborne Express, Alaska Airlines, Aloha Airlines, America West Airlines, American Airlines,
American Trans Air, Atlas Air, Continental Airlines, Delta Air Lines, DHL Airways, Emery Worldwide Airlines,
Evergreen International Airlines, FedEx, Hawaiian Airlines, JetBlue Airways, Midwest Express Airlines, Northwest
Airlines, Polar Air Cargo, Southwest Airlines, United Airlines, UPS Airlines, and US Airways. Associate members
are Aeromexico, Air Canada, Air Jamaica, KLM Royal Dutch Airlines, and Mexicana

[2] Similar guidance is also being requested from the Agriculture Department, Immigration and Naturalization Service,
Customs Service and Department of Transportation, all of which either impose or administer fees on certain
passengers.

■
**AIR TRANSPORT ASSOCIATION OF AMERICA, INC.**
1301 PENNSYLVANIA AVENUE, NW SUITE 1100 WASHINGTON, DC 20004-1707
626.4000 www.airlines.org

Randall Fiertz
October 9, 2002
Page 2

certain passengers at the time a ticket is sold and they remit the fees within a prescribed time period to the agency. If a passenger's ticket expires, and the passenger is not entitled to a refund of the fare from the airline, is the previously collected the Passenger Security Service Fee applicable to the unused travel refundable to the passenger? If so, from whom does the passenger request the refund, since in many cases the airline has already remitted the funds collected, and it would not otherwise be issuing a refund to the passenger?

The Internal Revenue Service previously considered an analogous situation. In Revenue Ruling 89-109, the IRS held that "to the extent the airline does not refund to the passenger the amount paid for the air transportation, the collected transportation tax attributable to such nonrefunded amount is to be remitted to the Government

Because of multiple inquiries to ATA members concerning such fees, we would appreciate receiving the requested guidance as soon as possible. If you have any questions or need additional information, I can be reached at 202-626-4213.

Sincerely,

James A. Hultquist
Managing Director, Taxes


CC: Steven Cohen, Transportation Security Administration

# TSA 2020 Guidance Letter
# TSA-2001-11120-0680



**U.S. Department of Homeland Security**
**Arlington, Virginia 20598-6014**

March 20, 2020

## GUIDANCE TO INDUSTRY

The Transportation Security Administration (TSA) understands that COVID-19 (Coronavirus) has had great impact on travelers, the general public, and the air carrier industry.  During this unprecedented event, air carriers may be facing an extreme economic situation where monthly TSA September 11th Security Fee (Passenger Fee)[1] refunds to passengers may be greater than the monthly Passenger Fees imposed and collected by your company.

To uniformly address recent inquiries on this matter and consistent with the guidance TSA issued to industry on November 21, 2002 regarding Passenger Fee[2] refunds, this guidance letter is issued to provide uniform clarification to industry during this unparalleled event.

TSA allows air carriers to offset Passenger Fee refunds to passengers by deducting the refunds from current Passenger Fee liabilities due and owing to TSA for a given month. In cases where monthly Passenger Fee refunds to passengers are greater than monthly liabilities, an air carrier may continue to offset from a future Passenger Fee liability or request a return of the Passenger Fees remitted to TSA. If requesting a return of Passenger Fees previously remitted to TSA, an air carrier must provide documentation supported by your accounting system demonstrating the calculation of the request. Air carriers must also retain auditable records related to such a request per 49 CFR Part 1510.15-19.

When requested by a passenger, TSA considers a passenger fee refund a return of payment preferably in the form of original payment. Retaining any portion of the fee or providing credit towards future services, with or without an expiration, does not constitute a refund.

***If an air carrier does not refund the Passenger Fee to the passenger, the fee shall be remitted or remain with TSA.  All fees for the period of February 2020 continue to be due to TSA no later than March 31, 2020 and each month thereafter.***

TSA appreciates the continued cooperation of or air carrier partners during the extraordinary operating environment.  We continue to welcome any further comments and concerns from our customer air carriers and their associations. If you have any questions in these matters, please contact the TSA Office of Revenue at (571) 227-2323 or tsa-fees@dhs.gov.

---

[1] 49 CFR Part 1510.

[2] See original guidance at https://www.regulations.gov/document?D=TSA-2001-11120-0059.